AMERICAN CIVIL LIBERTIES
UNION, and Micki Levin,
Plaintiffs-Appellees,

v.

CITY OF BIRMINGHAM,
Defendant-Appellant.

No. 84–1637.

United States Court of Appeals,
Sixth Circuit.

Argued Feb. 27, 1986.

Decided June 11, 1986.

Jon H. Kingsepp, Beier, Howlett, Hayward, McConnell, McCann, Jones, Kingsepp, Shea, Charles J. Porter (argued), Bloomfield Hills, Mich., for defendant-appellant.

Daniel J. Popeo, George Smith, Washington, D.C., amicus curiae (Washington Legal Foundation).

James Schuster, Robert A. Sedler (argued), Detroit, Mich., for plaintiffs-appellees.

Before LIVELY, Chief Judge, and MERRITT and NELSON, Circuit Judges.

LIVELY, Chief Judge.

This First Amendment case involves the Christmastime display of a city-owned creche, or nativity scene, on the front lawn of the city hall of Birmingham, Michigan. Much of the argument before the district court concerned the application to this case of the Supreme Court's decision in *Lynch v. Donnelly*, 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984). In *Lynch* the Court found no First Amendment violation in Pawtucket, Rhode Island's inclusion of a city-owned creche in a seasonal display containing many familiar Christmas symbols such as decorated trees, candy striped poles and a Santa Claus house and reindeer-powered sleigh. The district court distinguished *Lynch* and held that the display violated the Establishment Clause. *American Civil Liberties Union v. City of Bir-*

*mingham,* 588 F.Supp. 1337 (E.D.Mich. 1984).

## I.

The facts are not in dispute. The district court stated the admitted facts as follows:

1. Annually, during the Christmas season, from approximately late November through early January of the following year, the City of Birmingham displays a nativity scene on the lawn of the Birmingham City Hall. The nativity scene is comprised of figurines depicting the Christ Child, the Mother Mary, Joseph, three costumed shepherds, and several lambs. Absolutely nothing else is included in the display.

2. In all matters herein, the defendant city was acting as a governmental unit under color of state law, custom or usage, by and through its functionaries, employees, agents or elected officials.

3. The nativity scene was displayed on public property in front of Birmingham City Hall, a place open to the general public. When not displayed on public property, it was stored on public property. The figures in the nativity scene were built at public expense, and the electricity used in connection with the display was furnished out of public funds. The nativity scene was cleaned, restored, repaired and maintained at public expense, and was dismantled and conveyed to storage by public employees at public expense.

588 F.Supp. 1338. The district court described the Christmas display challenged in *Lynch* and discussed the Supreme Court's holding as follows:

The Pawtucket display was situated in a park owned by a non-profit organization and was located in the heart of the Pawtucket shopping district. It consisted of many of the figures and decorations traditionally associated with the winter holiday season, including a Santa Clause [sic] house, reindeer pulling Santa's sleigh, candy-striped poles, a Christmas tree, carolers, cutout figures representing a clown, an elephant, and a teddy bear, a "SEASONS GREETINGS" banner and hundred of lights, as well as the nativity scene. The court in *Lynch* determined that the display was sponsored by the city of Pawtucket in order to celebrate the holiday season and to depict the origins of that holiday, and that there were legitimate secular purposes for the display. There being secular purposes for the display, the court found that there was no attempt by the defendant city to express any kind of subtle government advocacy of a particular religious message.

Although the *Lynch* opinion is replete with references to the significant role that religion has played in the development of our nation, it does not, either on its face or in any implicit proclamation, hold that a nativity scene standing alone, or that any other single religious symbol or group of such symbols erected on public property with public funds, complies with the requirements of the separation of church and state required by our Constitution.

*Id.* at 1338–39.

As the Supreme Court did in *Lynch,* the district court in the present case applied the three-part test of *Lemon v. Kurtzman,* 403 U.S. 602, 612–13, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971), to determine whether a challenged practice is permitted:

First, the practice must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; finally, it must not foster an excessive government entanglement with religion.

*Id.* at 1339.

The district court concluded that the Birmingham creche display failed all three prongs of the *Lemon* test. Emphasizing the absence of any nonreligious Christmas symbols in the Birmingham setting, the

district court found no secular purpose for the display. In addition, the district court found it clear that the primary effect of the display "must be to advance, affirm, approve and otherwise validate the Christian religion, in that implicit government support of the religion represented by the sacred figures must be presumed by onlookers." *Id.* The district court found that the display failed the third *Lemon* test—excessive entanglement—because its purely religious character "might cause political divisiveness." *Id.*

## II.

This appeal was well briefed by the parties and amici, and well argued. There is a temptation for the court to write too much in a case such as this, since the Establishment Clause has produced a confusing body of law, which is sometimes difficult to apply. Despite the absolute language employed by the authors of the First Amendment and Thomas Jefferson's metaphorical reference to the "wall" between church and state, the Supreme Court has approved many "accommodations" to the religious heritage of the nation.

■ The particular condition that the Founding Fathers sought to prohibit by inclusion of the Establishment Clause in the First Amendment was the often tyrannical alliance between European governments and their official state religions. There was to be no established national church in the United States. However, the Establishment Clause was concerned with a larger evil, most often embodied in the establishment of official churches. The larger evil is government involvement in individual religious decisions. Every person must be free to make decisions in religious matters without any compulsion or interference by government. A statute or government practice that has the effect of impeding individuals from making free choices in religious matters by appearing either to embrace or reject a particular

religion violates the Establishment Clause. This analysis seems consistent with that of Justice O'Connor, who concurred separately in *Lynch*, a 5 to 4 decision. Justice O'Connor stated the central issue in *Lynch* as whether the city endorsed Christianity by its display of the creche. After eliminating the issue of excessive entanglement, she approached the remaining two prongs of the *Lemon* test as follows:

> The purpose prong of the *Lemon* test asks whether government's actual purpose is to endorse or disapprove of religion. The effect prong asks whether, irrespective of government's actual purpose, the practice under review in fact conveys a message of endorsement or disapproval. An affirmative answer to either question should render the challenged practice invalid.

*Lynch,* 465 U.S. at 690, 104 S.Ct. at 1368.

A majority of the Supreme Court appears to have adopted this approach. In *Grand Rapids School District v. Ball,* —— U.S. ——, 105 S.Ct. 3216, 3226, 87 L.Ed.2d 267 (1985), Justice Brennan wrote for the Court:

> Government promotes religion as effectively when it fosters a close identification of its powers and responsibilities with those of any—or all—religious denominations as when it attempts to inculcate specific religious doctrines. If this identification conveys a message of government endorsement or disapproval of religion, a core purpose of the Establishment Clause is violated. See *Lynch v. Donnelly,* 465 U.S. 668, 687, 104 S.Ct. 1355, 1366, 79 L.Ed.2d 604 (1984) (O'CONNOR, J., concurring).

(Citation omitted).

We will attempt the same approach in the present case.

## III.

In support of the district court's holding, the plaintiffs point to differences between

the facts in *Lynch* and those disclosed by the present record. In his opinion for the *Lynch* majority Chief Justice Burger described the Pawtucket Christmas display:

Each year, in cooperation with the downtown retail merchants' association, the city of Pawtucket, R.I., erects a Christmas display as part of its observance of the Christmas holiday season. The display is situated in a park owned by a nonprofit organization and located in the heart of the shopping district. The display is essentially like those to be found in hundreds of towns or cities across the Nation—often on public grounds—during the Christmas season. The Pawtucket display comprises many of the figures and decorations traditionally associated with Christmas, including, among other things, a Santa Claus house, reindeer pulling Santa's sleigh, candy-striped poles, a Christmas tree, carolers, cutout figures representing such characters as a clown, an elephant, and a teddy bear, hundreds of colored lights, a large banner that reads "SEASONS GREETINGS," and the crèche at issue here. All components of this display are owned by the city.

The crèche, which has been included in the display for 40 or more years, consists of the traditional figures, including the Infant Jesus, Mary and Joseph, angels, shepherds, kings, and animals, all ranging in height from 5″ to 5′. In 1973, when the present crèche was acquired, it cost the city $1,365; it now is valued at $200. The erection and dismantling of the crèche costs the city about $20 per year; nominal expenses are incurred in lighting the crèche. No money has been expended on its maintenance for the past 10 years.

465 U.S. at 671, 104 S.Ct. at 1358. The plaintiffs emphasize the repeated references in *Lynch* to the "inclusion" of the nativity scene within the larger display in contrast to the "unadorned" creche on the city hall lawn in the present case. They maintain that the primary effect of a nativity scene standing alone in a prominent position on city property is to send an unmistakable signal to observers that Christianity is officially endorsed by the city.

The city responds that the absence of other Christmas paraphernalia in the setting of the creche is unimportant.[1] It was inclusion of the creche *in the Christmas celebration* that was approved in *Lynch*, not its inclusion in a display containing nonreligious Christmas symbols, the city asserts. The city concedes that the creche display "advances religion in a sense," but argues that this is merely an indirect and incidental effect of its inclusion in the observance of the national holiday. The holiday has a religious origin, which was recognized when Congress set aside that day for official observance. The inclusion of the symbol of this origin, according to the city, does nothing more to advance Christianity than the original decision to make Christmas a national holiday.

The city relies heavily on *McCreary v. Stone*, 739 F.2d 716 (2d Cir.1984), *affirmed by an equally divided court sub nom. Board of Trustees of Village of Scarsdale v. McCreary*, —— U.S. ——, 105 S.Ct. 1859, 85 L.Ed.2d 63 (1985), a decision which the district court here declined to follow. In *McCreary*, the Village of Scarsdale, New York had permitted a civic group to place a creche in a city-owned park in the center of the business district for two weeks during the Christmas holiday season. The Scarsdale creche was placed on city-owned land, while the Pawtucket creche was displayed in a park owned by a private organization. Also, the Scarsdale creche was "unadorned," that is, it stood alone rather than as part of a larger display including secular symbols of the holiday. The Scarsdale dis-

---

**1.** The only other city decorations consisted of natural bough wreaths and approximately 1000 strings of lights placed on city trees and buildings in the business district of Birmingham.

play also contained a small disclaimer sign that read, "This creche has been erected and maintained solely by the Scarsdale Creche Committee, a private organization." When objections were voiced to this practice the city denied an application to display the creche during the 1983 holiday season. The district court upheld the city's action on First Amendment grounds, but the court of appeals reversed, finding that permitting the display did not have the direct and immediate effect of advancing religion. In *McCreary,* the Second Circuit found the factual differences between the Scarsdale case and *Lynch* unimportant.

The plaintiffs respond to this argument by pointing out that *McCreary* involved the denial of an application to place a creche in a park that was a recognized public forum, implicating freedom of speech as well as of worship. Further, while reversing, the court of appeals remanded to the district court to enter an order providing a larger, more visible sign, and concluded:

> We believe that a proper disclaimer message—especially when coupled with the presence of the valid secular purpose, the lack of excessive entanglement, the Village's general grants of access to its public properties and the publicity the Village's official views have received in Scarsdale—will ensure that no reasonable person will draw an inference that the Village supports any church, faith or religion associated with the display of a creche during the Christmas season at Boniface Circle.

739 F.2d at 728. The plaintiffs argue that the public forum issue was critical to the decision in *McCreary* and that the result might well have been different without this factor and if there had been no disclaimer of city involvement.

## IV.

█ The district court erred in concluding that the display in Birmingham had no secular purpose and that it fostered excessive government entanglement with religion.

### A.

The Supreme Court made clear in *Lynch* that a totally secular purpose is not required. The City of Pawtucket was joining in the celebration of a national holiday and inclusion of the creche in the display served only to depict the historical origins of the celebration. 465 U.S. at 681, 104 S.Ct. at 1363. The same reasoning applies to the display in the present case. The City of Birmingham concedes that the nativity scene has religious significance. However, the city manager testified that the purpose of the display is "to be in keeping with the expression of the total community toward that period of the year." To him the creche was "just one element, an expression of joy, goodwill, that people have for one another in a community sense."

A statute or practice that is motivated in part by a religious purpose may satisfy the first *Lemon* criterion so long as it is not motivated entirely by a purpose to advance religion. *Wallace v. Jaffree,* —— U.S. ——, 105 S.Ct. 2479, 2490, 86 L.Ed.2d 29 (1985). Given the holding in *Lynch* we cannot find that inclusion of the creche in the celebration of Christmas as a national holiday was devoid of all secular purpose. The record does not support a finding that the "actual purpose" of displaying the creche was to endorse religion. *Lynch,* 465 U.S. at 690, 104 S.Ct. at 1367. (O'Connor, J., concurring).

### B.

In *Lynch* the Supreme Court also made it clear that in the absence of excessive administrative entanglement fostered by the challenged government action, political divisiveness alone cannot render otherwise permissible official conduct invalid. Other than the present lawsuit, apparently no complaints had been registered about the Birmingham creche. Since the city owned

the creche and no church or other religious entity was involved in the annual display, there was no evidence of entanglement. The district court erred as a matter of law in finding that the city failed to satisfy the third prong of the *Lemon* test.

### V.

Our most difficult problem is to determine whether the effect of the creche in the Birmingham setting was to endorse Christianity. The fact that the display "advances religion in a sense" is not controlling. *Lynch*, 465 U.S. at 683, 104 S.Ct. at 1364. More pertinent is the question whether any benefit to religion from the display is direct and immediate, or only "indirect, remote, and incidental." *Id.*

In *Lynch* the Supreme Court stated that the district court erred in "focusing almost exclusively on the creche," and cautioned that the display must be viewed "in the proper context of the Christmas Holiday season." 465 U.S. at 680, 104 S.Ct. at 1362. Given that the City of Birmingham had a secular purpose for displaying the creche—to promote a feeling of joy and goodwill—our remaining inquiry is whether the display did in fact convey a message of endorsement of Christianity.

The Birmingham city hall display called attention to a single aspect of the Christmas holiday—its religious origin. A creche standing alone without any of the nonreligious symbols of Christmas affirms the most fundamental of Christian beliefs—that the birth of Jesus was not just another historical event. Rather, to the believer Christ's birth was an act of divine intervention in human affairs that set this birth apart from all others. The same witness who described the city's secular purpose stated that the creche "is consistent with the recognition of the Christmas Day, Holiday that's granted and the significance of that date as being the birth of the Christ Child." He also testified, "There are Nativity Scenes in every church around";

"[t]he Nativity Scene, whether it be at City Hall or any other place does have a religious significance to me."

This reaction to the creche is normal, and presumably universal. The creche has no other significance or message—it is a purely religious symbol. When surrounded by a multitude of secular symbols of Christmas, a nativity scene may do no more than remind an observer that the holiday has a religious origin. But when the nonreligious trappings—accretions of the centuries—are stripped away, there remains only the universally recognized symbol for the central affirmation of a single religion—Christianity. To the extent that the *McCreary* court's decision may be read to hold that a city may place a creche unaccompanied by any nonreligious symbols of the holiday in a prominent position on the lawn of the official headquarters building of the municipal government, we disagree.

Since the majority does not need its protections, the Bill of Rights was adopted for the benefit and protection of minorities. From the beginning, Christians have constituted a majority in America and non-Christians are acutely aware of this fact. Their assurance of equality before the law, despite their religious nonconformance, derives from the guarantees of the First Amendment. It is difficult to believe that the city's practice of displaying an unadorned creche on the city hall lawn would not convey to a non-Christian a message that the city endorses Christianity. The creche, thus displayed,

> sends a message to nonadherents that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community.

*Lynch*, 465 U.S. at 688, 104 S.Ct. at 1366 (O'Connor, J., concurring).

We have not overlooked the admonition in *Lynch* to view the creche "in the proper

context of the Christmas Holiday season." In *Lynch* the city's observance of the season consisted of the use of a wide variety of secular symbols of the season. Justice O'Connor noted, "The creche is a traditional symbol of the holiday that is very commonly displayed *along with purely secular symbols,* as it was in Pawtucket." 465 U.S. at 692, 104 S.Ct. at 1369 (emphasis added). Set in the midst of such a display the nativity scene might be held to do no more than remind an observer that this season of feasting and gift-giving has a religious origin. Thus, the Court wrote, "The creche *in the display* depicts the historical origins of this traditional event long recognized as a National Holiday." *Lynch,* 465 U.S. at 680, 104 S.Ct. at 1362 (emphasis added). In our opinion, the city-owned and city-sponsored nativity scene sends quite a different message when it stands alone as the only clearly identifiable symbol chosen by the city to mark its contribution to the celebration. The direct and immediate effect of such a display is endorsement of a particular religion.

The judgment of the district court is affirmed.

DAVID A. NELSON, Circuit Judge, dissenting.

If it is an "establishment of religion" for a city to display an unadorned nativity scene at Christmas, I would have thought it no less an establishment of religion for the City to display a nativity scene adorned with a panoply of other Christmas symbols, such as lighted Christmas trees, reindeer, and, as the Christmas poem puts it, "a sleigh full of toys—and St. Nicholas, too."

The Supreme Court having told us that a nativity scene with other Christmas symbols is constitutional, I am therefore troubled by the conclusion that a nativity scene without them is not.

Were we writing on a clean slate, this case might have given us less difficulty than it has. We would then have looked at the language of the First Amendment ("Congress shall make no law respecting an establishment of religion") and decided whether or not the City of Birmingham is "Congress." Answering that question in the negative, we would have turned, presumably, to the Fourteenth Amendment and considered whether anything in its text [1] or in the history of its adoption suggests an intent to empower the federal judiciary, in the absence of "appropriate legislation" enacted by Congress, to tell municipalities how they may decorate their buildings and grounds for Christmas. I am not sure that we could have detected such an intent, as an original proposition.

Our slate has already been written on rather extensively, however, and although it may bear the signs of a few erasures and may have picked up a certain amount of chalk dust, it contains some very plain instructions on how we are to approach our present assignment. We are to take it as given, for example, that the Establishment Clause of the First Amendment has been made binding on the states through the Fourteenth Amendment; that the Fourteenth Amendment (unlike the Eleventh) uses the word "State" to include cities, towns and other political subdivisions; and that the prohibition against legislation respecting an establishment of religion ex-

---

1. The only sections of the Fourteenth Amendment that could be considered relevant are sections 1 and 5. Section 1 provides:

    "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

    Section 5 provides:

    "The Congress shall have power to enforce, by appropriate legislation, the provisions of this article."

tends to executive action as well as legislative.

All this, I think, the decisions of the Supreme Court make clear. What is not so clear, in the context of this case and in the absence of explicit guidance from Congress, is how the Supreme Court would have us construe the words "an establishment of religion."

Where we are called upon to decide a constitutional question that has not yet been squarely addressed by the Supreme Court, we need not—and I think we should not—close our minds to the history of our institutions, to the customs and traditions of our people, or (borrowing a phrase from Lord Coke) to our sense of "common right and resoun." Neither should we close our minds to the logic that informs those Supreme Court decisions which most closely concern our question, even if they do not answer it. Open our minds as we will, however, we are likely to find unanimity of opinion elusive where the subject is the constitutional relationship between church and state. I express my own thoughts on this subject with some diffidence, knowing that I am in territory where the boundary between orthodoxy and heresy, shifted more than once in the past, is probably not firmly fixed yet.

The phrase "establishment of religion" may have been something of a chameleon term even in the days of the Founders, but few people then, I think, would have disagreed over the common core of meaning behind it. The clause in which the phrase occurs "forbids an established church or anything approaching it," *Lynch v. Donnelly*, 465 U.S. 668, 673, 104 S.Ct. 1355, 1359, 79 L.Ed.2d 604 (1984),[2] and the late 18th Century was not unfamiliar with state-established churches of one kind or another. South Carolina provides a good example. The constitution adopted by that state in 1778, some thirteen years before the adoption of the First Amendment, "provided that *only Protestants* could sit in the two houses of the state legislature," and it "put the point as forthrightly as anyone could ask: 'The Christian Protestant religion shall be deemed, and is hereby constituted and declared to be, the established religion of this State.'" William Lee Miller, *The First Liberty: Religion and the American Republic* (1986), p. 19. Ezra Stiles, a Congregational minister in Rhode Island, has been quoted as stating (in 1761) "that the laws of New Hampshire and Massachusetts 'as fully established congregationalism ... as the acts of parliament ... establish episcopacy in South Britain.'" Thomas J. Curry, *The First Freedoms: Church and State in America to the Passage of the First Amendment* (1986), p. 120. "Establishment of religion," as the term was used in the days of the Founders, connoted such things as the payment of

---

2. *Cf.* this passage from the description, in the Annals of Congress, of the discussion in the House of Representatives of the Report of the Select Committee that considered the proposed Bill of Rights presented by James Madison:

"Mr. Madison said, he apprehended the meaning of the words to be, that Congress should not establish a religion, and enforce the legal observation of it by law, nor compel men to worship God in any manner contrary to their conscience." (Quoted in Thomas J. Curry, *The First Freedoms: Church and State in America to the Passage of the First Amendment* (1986), p. 200.)

"In actuality," a modern scholar tells us, "the founders generally regarded establishment as a direct support of religion by government—the kind many of them had experienced in the colonial past and still had before them in several of the states." A. James Reichley, *Religion in American Public Life* (1985), p. 158.

As a matter of law, the First Amendment has been construed to be "more than a pledge that no single religion will be designated as a state religion," and "more than a mere injunction that governmental programs discriminating among religions are unconstitutional." *Grand Rapids School District v. Ball*, 473 U.S. ——, ——, 105 S.Ct. 3216, 3221, 87 L.Ed.2d 267, 275 (1985). As a matter of history, however, "[t]he evil to be aimed at ... appears to have been the establishment of a national church, and perhaps the preference of one religious sect over another...." *Wallace v. Jaffree*, 472 U.S. ——, ——, 105 S.Ct. 2479, 2513, 86 L.Ed.2d 29, 71 (1985) (Rehnquist, J., dissenting.)

clerical salaries by the state, the governmental prescription of articles of faith, the imposition of religious tests for office, and the official endorsement of particular forms of worship. The Founders might well have been surprised to learn some of the connotations the term has taken on in recent years.

Does the conduct of the City of Birmingham in erecting a manger scene on city property during the Christmas season come impermissibly close to the making of a "law respecting an establishment of religion" within the current meaning of those words? I do not read *Lynch v. Donnelly* as teaching that it does, but this court has drawn from that case a different lesson. The lesson comes down to this: a city is free to display such a scene at Christmas if it is balanced by symbols which, although they may also be associated with Christmas, are considered secular in origin. If enough such symbols are displayed, the manger scene will pass constitutional muster. It may be convenient to think of this as a "St. Nicholas too" test—a city can get by with displaying a creche if it throws in a sleigh full of toys and a Santa Claus, too.

The application of such a test may prove troublesome in practice. Will a mere Santa Claus suffice, or must there also be a Mrs. Claus? Are reindeer needed? If so, will one do or must there be a full complement of eight? Or is it now nine? Where in the works of Story, Cooley or Tribe are we to find answers to constitutional questions such as these?

The point I am trying to make is a serious one, of course. The holiday we celebrate as Christmas began as a pagan festival millennia before the birth of Christ, and "some people have thought that the Christians invented Christmas to compete against the pagan celebrations of December twenty-fifth." Earl W. Count, *4000 Years of Christmas* (1948), pp. 18 & 27. The symbolism of Christmas in the 20th Century A.D. continues to incorporate many pagan elements, and Christmas would hardly be Christmas, for most Americans, without them. But I question whether it is appropriate for the federal courts to tell the towns and villages of America how much paganism they need to put in their Christmas decorations, and I am reluctant to attribute to the Supreme Court an intent to point us in that direction by implication.

I am strengthened in my conclusion that *Lynch* does not require us to apply a "St. Nicholas too" test by the fact that the Court of Appeals for the Second Circuit (Mansfield, Pierce and Pratt, JJ.,) has specifically rejected the assertion that *Lynch* adopts such a test. In explaining why that reading of *Lynch* is "erroneous," the Second Circuit said:

"The Supreme Court did not decide the Pawtucket case based upon the physical context within which the display of the creche was situated; rather, the Court consistently referred to 'the creche in the context of the Christmas season,' *id.* 104 S.Ct. at 1362, or the 'Christmas Holiday season,' *id.* After determining that the proper context for analysis was the Christmas season, the Court noted:

To forbid the use of this one passive symbol—the creche—*at the very time people are taking note of the season* with Christmas hymns and carols in public schools and other public places, and while the Congress and Legislatures open sessions with prayers by paid chaplains would be a stilted overreaction contrary to our history and to our holdings. If the presence of the creche in this display violates the Establishment Clause, a host of other forms of taking official note of Christmas, and of our religious heritage, are equally offensive to the Constitution.

*Lynch,* 104 S.Ct. at 1365 (emphasis added). Thus, the Village's display-context argument fails."

*McCreary v. Stone,* 739 F.2d 716, 729 (2d Cir.1984), *aff'd. by an equally divided*

*court sub nom. Board of Trustees of the Village of Scarsdale v. McCreary,* 471 U.S. ——, 105 S.Ct. 1859, 85 L.Ed.2d 63 (1985).

As a practical matter, to be sure, a "St. Nicholas too" approach may not be a bad compromise of the conflict between the view that the Establishment Clause bars all religious symbols on government property[3] and the view—a more traditional view, it is fair to say—that the First and Fourteenth Amendments were intended to do no such thing. The conflict is obviously a sharp one.

Whatever the actual intent of the people who originated Birmingham's nativity scene more than 30 years ago, and whatever their Christological views may actually have been, the plaintiff in this case views the display as "constituting an official endorsement of the Christian religion and of its principal tenet, the divinity of Jesus." The evil of such an "endorsement," she argues in terms taken from Justice O'Connor's concurring opinion in *Lynch*, is that it sends "a message to non-Christians that they are outsiders and not full members of the Birmingham political community."

But is this really Birmingham's message? The record before us is not particularly illuminating,[4] nor should we expect it to be: the question is "in large part a legal question to be answered on the basis of judicial interpretation of social facts." *Lynch v. Donnelly,* 465 U.S. at 694, 104 S.Ct. at 1369 (O'Connor, J., concurring.) I am not persuaded that the social facts of our time justify the conclusion that the City of Birmingham can reasonably be said to have endorsed Christianity or to have sent non-Christians an impermissible message.

Does the federal government send non-Christians an impermissible message when, without benefit of St. Nicholas, it sells individual postage stamps depicting Mary and the infant Jesus, as it did in one recent Christmas season, or depicting Mary alone, as it did at another Christmastime? Does the federal government send a message to non-believers that they are "outsiders" when it hires chaplains for its armed forces, its prisons, and its Congress? Or when it places the motto "In God We Trust" on (of all things) its currency? Or when it passes legislation (as it did after some of us had reached adulthood) adding the words "under God" to the Pledge of Allegiance? Evidently not; yet the Establishment Clause is no less binding on the United States, whose Congress the First Amendment expressly names, than on political subdivisions of individual states.

It is not a persuasive rejoinder, I think, that unlike municipal nativity scenes, some of the federal government's accommodations of religion—the hiring of chaplains, *e.g.*—have been with us since the founding of the Republic. One message conveyed by the relatively recent advent of these nativity scenes, as I shall try to show, is that we have become a more diverse and tolerant society than we used to be. That message hardly stamps nativity scenes with the mark of Cain.

There was no State of Michigan when the First Amendment was adopted, but it is

---

**3.** The individual plaintiff in this case testified, in effect, that she thought a "strict" interpretation of the First Amendment would require the removal of every cross from Arlington National Cemetery.

**4.** The record does show that the plaintiff is incorrect in her suggestion that the Birmingham creche is "unadorned" by any other Christmas symbolism. Immediately behind the nativity scene grows an evergreen tree—a typical Christmas tree—which the city decorates, during the holiday season, with colored lights. The city hall property as a whole has perhaps twelve trees, each of which is decorated at Christmastime with five or six strings of lights. Going outside the city hall property, there is testimony that the city decorates the trees of its central business district with over 1,000 strings of Christmas lights. Could the presence of such Christmas lights on the city's trees redeem the nativity scene under a "St. Nicholas too" test? This court evidently thinks not, and I obviously have no basis for quarrelling with that judgment.

safe to assume that the home states of most of the early settlers in what was to become the State of Michigan had no nativity scenes on public display in December of 1791. This was not because of any sense that the states should refrain from "endorsing" Christianity—states commonly did that—but because of considerations that were themselves religious in origin and that helped shape the aesthetic sensibilities of those whose culture was inherited from the wave of British Protestants who came here in the 17th Century. If it is true today, as I believe it is, that the adherents of most religions (or of no religion) have no particular reason to be offended by the sight of a municipal nativity scene at Christmas, that was certainly not true as far as our Puritan forebears were concerned. "To the Puritans," as Justice Brennan pointed out in his *Lynch v. Donnelly* dissent, "the celebration of Christmas represented a 'Popish' practice lacking any foundation in Scripture." 465 U.S. at 721, 104 S.Ct. at 1384. The display of a creche would have been considered rank idolatry by the Puritans; but the Puritans' strong prejudice against Catholicism—a prejudice that did not extend to Judaism, incidently—has largely vanished from the United States of the 1980s. The rise in the popularity of nativity scenes is not unrelated to (and to some extent has been made possible by) the decline of cultural and religious prejudice in this country and by the gradual dilution of the British Puritanism that has been called the "single most influential cultural force at work in the new nation." A. James Reichley, *Religion in American Public Life* (1985), p. 53.

Although the Puritans would have been appalled at the public display of a nativity scene—with or without a St. Nicholas—they would hardly have been appalled if they could have heard Justice Brewer declare, as he did approximately a century after adoption of the First Amendment and a quarter of a century after adoption of the Fourteenth, that "this is a Christian na-

tion." *Church of the Holy Trinity v. United States*, 143 U.S. 457, 471, 12 S.Ct. 511, 516, 36 L.Ed. 226 (1892). Justice Brewer's words may strike our ears as arrogant (see *Lynch v. Donnelly*, 465 U.S. at 718, 104 S.Ct. at 1382, Brennan, J., dissenting), but Justice Brewer spoke for a unanimous Supreme Court, the evidence marshalled in support of his proposition was extensive (see 143 U.S. at pp. 465–71, 12 S.Ct. at 514–16), and at the time they were uttered I have little doubt that Justice Brewer's words would have been widely accepted—by Christian and non-Christian alike—as an accurate statement of fact. Such was the climate of opinion when Congress first enacted legislation declaring Christmas Day a legal public holiday; but no one has ever successfully challenged the constitutionality of the statute (now codified at 5 U.S.C. § 6103) that gives official legal status to the day that many Christians celebrate as the birthday of Christ.

The nation has changed since Justice Brewer's day—doubtless for the better, in some respects—but if our courts no longer speak of us as a "Christian" nation, I think it is still the common sense of our people that nothing in the Constitution requires the state and religion to "be aliens to each other." *Zorach v. Clauson*, 343 U.S. 306, 312, 72 S.Ct. 679, 683, 96 L.Ed. 954 (1952), (per Douglas, J., speaking for a divided Court.) If the Constitution's absolute prohibition against any governmental "establishment" of religion were construed as foreclosing all concert of whatever character between government and religion, the result would be totally at odds with what Justice Douglas took to be "the common sense of the matter:"

> "Prayers in our legislative halls; the appeals to the Almighty in the messages of the Chief Executive; the proclamations making Thanksgiving Day a holiday; so help me God in our courtroom oaths—these and all other references to the Almighty that run through our laws, our public rituals, our ceremonies would be

**1572**

flouting the First Amendment. A fastidious atheist or agnostic could even object to the supplication with which the Court opens each session: God save the United States and this Honorable Court." 343 U.S. at 312–13, 72 S.Ct. at 683.

It would not worry me unduly if a "fastidious atheist or agnostic" found the City of Birmingham's nativity scene offensive on aesthetic or philosophical grounds, or if a modern day Puritan objected to it on religious grounds. I might be able to sympathize with such a point of view, but I would consider it largely irrelevant from a legal standpoint; not everything that gives offense in this world is unconstitutional.

The situation of Birmingham's Jewish citizens, however, calls for special comment; if anyone has a legitimate basis for objecting to the nativity scene, it is they. (It may be appropriate to note, at this point, that there is no Jewish plaintiff in this case.) It was all very well, perhaps, for Benjamin Disraeli to observe, as he did through a character in one of his novels, that "half of Christendom worships a Jew and the other half worships His mother," but the fact remains that for much of the last two millennia the behavior of the Christian church, the Christian state, and many individual Christians toward the people and the religion from which Christianity sprang has ill comported with what many of us understand to be the teachings of Jesus. Our record in this country is better than the record elsewhere, in my submission, and our record has been improving, but there may well be Jews in Birmingham who nonetheless find it discomfiting that their municipal government should make as much as it does of a holiday as closely associated with Christianity as Christmas. I understand that concern, and am less certain of the correctness of my position in this case because of it.

When I examine the "social facts" as dispassionately as I can, however, and try to apply the law I am sworn to uphold as I am given to understand it, I cannot find any constitutional infirmity in what the city has done. I see no anti-Jewish animus in Birmingham's observance of Christmas, and I know of no basis for any claim that the federal courts are empowered, under the First and Fourteenth Amendments, to prohibit Birmingham from observing Christmas in any manner reasonably appropriate to the season. The Fourteenth Amendment, which brought our states and cities under the First Amendment, did not empower the *judiciary* to enact appropriate enforcing legislation, it empowered the *Congress* to do so. Congress itself has made Christmas Day a legal public holiday, and has not seen fit to prohibit the display of municipal nativity scenes during the holiday season. It may or may not be wise for Birmingham to erect a Christmas creche—"unadorned" or otherwise—but that strikes me as a question more appropriately answered by the people, through their elected representatives, than by courts of law.

On balance, I think the result reached here runs counter to what Justice Douglas called "the common sense of the matter." It attributes to the City of Birmingham a message I am confident the city never intended to convey, and it attributes more to the words of the Establishment Clause than their history, at least, suggests they can bear. Our decision requires the people of Birmingham either to abandon or reshape one of their civic traditions, and in a small but measurable degree the decision diminishes the people's control over their own lives. I do not believe the Constitution compels this result, on the facts before us. I agree with the holding of the Court of Appeals for the Second Circuit in *McCreary v. Stone,* 739 F.2d 716, *supra,* and I would reverse the judgment of the trial court here.