Rachel **MATHER**, Plaintiff–Appellee,

v.

**VILLAGE OF MUNDELEIN,** Defendant–Appellant.

No. 88–3226.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 9, 1988.

Decided Jan. 4. 1989.

Rehearing Denied Feb. 21, 1989.

---

9. *Hathorn,* 102 S.Ct. at 2430.

Harold Hirshman and Robert B. Millner, Sonnenschein, Carlin, Nath & Rosenthal, Chicago, Ill., for plaintiff-appellee.

Charles F. Marino, Chicago, Ill., for defendant-appellant.

Before COFFEY, FLAUM, and EASTERBROOK, Circuit Judges.

PER CURIAM.

For a quarter century, the Village of Mundelein, Illinois, has displayed a nativity scene on the lawn of its village hall during the Christmas season, together with lights on the evergreens and a wreath and banner over the main door. In 1987 it added a Christmas tree with lights and, after questions had been raised about the propriety of displaying a crèche on public property, many other symbols of the season—a Santa Claus and sleigh, carolers, snowmen, carriage lights, wreaths, and two soldiers in the shape of nutcrackers. The Village declined to move the ensemble to a public park located some blocks from city hall. This suit followed, and the district court held that the display violates the Establishment Clause of the first amendment, made applicable to the states by the fourteenth. 699 F.Supp. 1300 (N.D.Ill.1988).

Two cases dominate here. The first is *Lynch v. Donnelly*, 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984), which holds that the Constitution does not forbid a display of a crèche, together with other holiday symbols, in a park adjoining the city hall, even though the city is closely associated in the public mind with the display. (The city owned the display, which the mayor opened each year; the same sound system piped carols into the park and the grounds of city hall.) The second is *American Jewish Congress v. City of Chicago*, 827 F.2d 120 (7th Cir.1987), which holds that the Constitution does forbid a city to display a crèche as the centerpiece of a display located inside city hall. We concluded that the display of an isolated religious symbol at the center of government unavoidably demonstrated the city's support for that religion, in violation of the Establishment Clause.

We must decide how best to characterize a crèche that is part of a display—and inevitably will be seen in the context of an ensemble of seasonal symbols—located on the grounds of city hall. The district court could "find no principled distinction between the Mundelein display and the unconstitutional display in Chicago's City Hall." *City of Chicago* concluded that characterization is a question of law, 827 F.2d at 123 (majority opinion), 129–30 (dissenting opinion), so we owe no deference to the district court's resolution. Although drawing lines in cases of this kind is difficult and troubling, and although this case is far from clear, on balance the Mundelein display comes closer to the one allowed in *Lynch* than to the one prohibited in *City of Chicago*.

Mundelein, like Pawtucket, Rhode Island (the municipality in *Lynch*), has placed the crèche in the context of other seasonal symbols, showing support for the holiday season rather than for the religious aspect alone. In *City of Chicago*, by contrast, "the nativity scene was self-contained, rather than one element of a larger dis-

play." 827 F.2d at 125. The display in Mundelein is outdoors, just as in Pawtucket. The display in Pawtucket was "like those to be found in hundreds of towns or cities across the nation—often on public grounds". *Lynch*, 465 U.S. at 671, 104 S.Ct. at 1358. Although the record does not permit us to decide whether the grounds of the village hall in Mundelein are a public forum, the presence of the display in a place open to the elements makes the context closer to that of the park in Pawtucket than to that of the center of Chicago's city hall. Cf. *United States v. Grace*, 461 U.S. 171, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983) (the sidewalks around the Supreme Court's building are public forums; a statute distinguishing between the sidewalks on the Court's side of the street and the sidewalks on the other side of the street is unconstitutional). Doubtless the display in Mundelein leads viewers to focus on the village hall more than the display in Pawtucket did; the display in Mundelein is in the shadow of the building, which serves as backdrop; the display in Pawtucket was 300 feet away, diminishing the effect of the building. The point of *Lynch*, however, is that the context—the context of the ensemble, and more important the context of the secular holiday the government observes—is the controlling consideration. Details that would be important to interior decorators do not spell the difference between constitutionality and unconstitutionality. This display was outdoors, and passers-by will see a grouping of symbols, most of which are secular. That, we believe, puts our case on the *Lynch* side of the line.

The parties and the district court have cited to us many cases, such as *Citizens v. City of Denver*, 526 F.Supp. 1310 (D.Colo. 1981), affirmed mem., No. 82–1022 (10th Cir. May 14, 1984), *American Civil Liberties Union v. City of Birmingham*, 791 F.2d 1561 (6th Cir.1986), and *American Civil Liberties Union v. County of Allegheny*, 842 F.2d 655 (3d Cir.), cert. granted, —— U.S. ——, 109 S.Ct. 53, 102 L.Ed.2d 32 (1988), that address the question whether particular displays, in particular settings, offend the Establishment Clause. There are so many variations that discussion would not illuminate—though the appearance of ever-finer lines in the cases, coupled with never-ending small variations in the displays of thousands of municipalities, leads us to hope that the Supreme Court will decide *County of Allegheny* in a way that diminishes the role of architectural judgment in constitutional law. The precedent in this court is *City of Chicago*, and that case, together with *Lynch*, leads us to hold that Mundelein may maintain the display as it has been assembled since 1987.

REVERSED.

COFFEY, Circuit Judge, concurring.

I join the court's opinion in this matter. The court aptly notes its "hope that the Supreme Court will decide *County of Allegheny* in a way which diminishes the role of architectural judgment in constitutional law." Panel op. at 1293. I write separately to underscore my desire for the Supreme Court to resolve *Allegheny* in a manner which will substitute the true and accurate historical and policy concerns underlying this Clause for the probing examination of legal minutiae which has crept in as the courts have been confronted with baseless Establishment Clause challenges, particularly in cases involving holiday displays utilizing religious themes, such as Christian crèches and Jewish menorahs.

After the Supreme Court decided *Lynch v. Donnelly*, 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984), it would have seemed logical to have thought that the Establishment Clause questions concerning holiday displays incorporating religious themes had been put to rest. In *Lynch* Chief Justice Burger, writing for the Court, observed that: "There is an unbroken history of official acknowledgment by all three branches of government of the role of religion in American life from at least 1789." 465 U.S. at 674, 104 S.Ct. at 1360. Examples of this historical acknowledgment were cited which included Executive Orders recognizing religiously grounded national holidays, the presence of religiously oriented work in publicly supported art galleries, and the printing on our currency of the national motto "In God We

**1294**

Trust." *Id.* at 675–77, 104 S.Ct. at 1360–61. To the examples cited by the Court, one could add the oaths taken by officeholders and witnesses in judicial proceedings, each of which recognize the existence of a deity, and the prayers of soldiers in combat or members of athletic teams prior to athletic contests in a public facility. The Court concluded its recitation of the historical examples of government recognition of religion, which included acknowledgment of religions other than Christianity, by stating:

> "One cannot look at even this brief resume [of historical examples] without finding that our history is pervaded by expressions of religious beliefs.... Equally pervasive is the evidence of accommodation of all faiths and all forms of religious expression and hostility toward none. Through this accommodation, as Justice Douglas observed, governmental action has 'follow[ed] the best of our traditions' and 'respect[ed] the religious nature of our people.' [*Zorach v. Clauson,* 343 U.S. 306, 314, 72 S.Ct. 679, 684, 96 L.Ed. 954 (1952)]."

465 U.S. at 677–78, 104 S.Ct. at 1361–62.

This history, the *Lynch* Court concluded, helped

> "explain why the Court consistently has declined to take a rigid, absolutist view of the Establishment Clause. [The Court has] refused 'to construe the Religion Clauses with a literalness that would undermine the ultimate constitutional objective *as illuminated by history.*' *Walz v. Tax Commission,* 397 U.S. 664, 671, 90 S.Ct. 1409, 1412, 25 L.Ed.2d 697 (1970) (emphasis added). In our modern, complex society, whose traditions and constitutional underpinnings rest on and encourage diversity and pluralism in all areas, an absolutist approach in applying the Establishment Clause is simplistic and has been uniformly rejected by the Court.
>
> "Rather than mechanically invalidating all governmental conduct or statutes that confer benefits or give special recognition to religion in general or to one faith —as an absolutist approach would dictate—the Court has scrutinized challenged legislation or official conduct to determine, whether, *in reality, it establishes a religion or religious faith, or tends to do so.*"

465 U.S. at 678, 104 S.Ct. at 1361 (emphasis added). Construing the Establishment Clause test set out in *Lemon v. Kurtzmann,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed. 2d 745 (1971), in light of the history and policies underlying this Clause, the *Lynch* Court concluded that the involved holiday display, considered in its proper context, did not tend to establish a religious faith.

The continuing challenge to displays which are alleged to be religiously oriented in the lower court cases subsequent to *Lynch,* demonstrates that *Lynch,* for some reason, did not put an end to conflict over the issue. I am convinced that a reasonable application of the historical and policy concerns set forth in *Lynch* mandates a most obvious legal conclusion that these displays do not violate the Establishment Clause when they include Christian, Jewish or other religious themes.

As discussed previously, the *Lynch* Court noted the historical precedent for governmental recognition of the religious traditions of its people. As a further historical point, *Lynch* also observed that while "[t]he concept of a 'wall' of separation is a useful figure of speech probably deriving from the views of Thomas Jefferson ... the metaphor itself is not a wholly accurate description of the practical aspects of the relationship that in fact exists between church and state." 465 U.S. at 673, 104 S.Ct. at 1359 (footnote omitted). This observation was, in effect, a criticism of the discussion of the historical foundations of the Establishment Clause found in *Everson v. Board of Education,* 330 U.S. 1, 16, 67 S.Ct. 504, 512, 91 L.Ed. 711 (1947). In his dissenting opinion in *Wallace v. Jaffree,* 472 U.S. 38, 91–92, 105 S.Ct. 2479, 2507–08, 86 L.Ed.2d 29 (1985) (Rehnquist, J., dissenting), then Justice Rehnquist was more direct in his criticism of the "wall of separation" concept, which he believed had been misapplied in *Everson* and later Supreme Court Establishment Clause cases based upon *Everson.* He stated:

"It is impossible to build sound constitutional doctrine upon a mistaken understanding of constitutional history, but unfortunately the Establishment Clause has been expressly freighted with Jefferson's misleading metaphor for nearly 40 years. Thomas Jefferson was of course in France at the time the constitutional Amendments known as the Bill of Rights were passed by Congress and ratified by the States. His letter to the Danbury Baptist Association [from which the 'wall of separation' concept was derived] was a short note of courtesy, written 14 years after the Amendments were passed by Congress. He would seem to any detached observer as a less than ideal source of contemporary history as to the meaning of the Religion Clauses of the First Amendment."

472 U.S. at 92, 105 S.Ct. at 2508. In his opinion Justice Rehnquist considered the history of the enactment of the Establishment Clause, which demonstrated that its leading framer, James Madison, "saw the Amendment as designed to prohibit the establishment of a national religion, and perhaps to prevent discrimination among sects[, but not] as requiring neutrality on the part of government between religion and irreligion." 472 U.S. at 98, 105 S.Ct. at 2511. Other evidence that the framers never so much as even intended to build a "wall of separation" between church and state included actions of the House of Representatives, contemporaneous to the passage of the Establishment Clause, in providing land grants for sectarian schools, *id.* at 100, 105 S.Ct. at 2512, and in requesting the President to issue a Thanksgiving Day proclamation. *Id.* at 100–02, 105 S.Ct. at 2512–13. Such proclamations have been issued by Presidents since that time. *Id.* at 103, 105 S.Ct. at 2514. In addition, aid was later given to sectarian education of native Americans carried on by religious organizations, including a grant to a tribe for the support of the tribe's Catholic church and priest. *Id.* at 103–04, 105 S.Ct. at 2513–14 (citing R. Cord, *Separation of Church and State*, 61–82 (1982)). From this evidence, Justice Rehnquist concluded that:

"[T]he Establishment Clause had acquired a well-accepted meaning: it forbade establishment of a national religion, and forbade preference among religious sects or denominations.... There is simply no historical foundation for the proposition that the Framers intended to build the 'wall of separation' that was constitutionalized in *Everson.*"

472 U.S. at 106, 105 S.Ct. at 2515.

It is clear from the historical evidence that the Establishment Clause was designed to prevent only the establishment of a *religion*, be it the Baptist faith, Lutheranism, Methodism, Episcopalianism, Judaism or Catholicism. It was never intended to prohibit government from taking actions, and government has not refrained from taking actions, which might have a minimal *religious* significance to persons of any faith or no faith, but do not "in reality ... establish a religion ... or tend[ ] to do so." *Lynch*, 465 U.S. at 678, 104 S.Ct. at 1362. This confusion between governmental actions which *in reality* tend to establish a *religion* and those which have an incidental *religious* significance, is at the root of many of the problems found in our current Establishment Clause jurisprudence. If the scope of the Establishment Clause is enlarged and extended to prevent mere governmental recognition of the tenets of believers or non-believers, Establishment Clause analysis no longer depends on whether the involved governmental action really is a step toward the establishment of a state religion and the Clause's original historic intent is totally obliterated. This point is illustrated in the Supreme Court's consideration of the analogous situation of legislative prayer. The Supreme Court emphasized that, in a country such as ours, in which law and culture have been founded in large measure on the Judeo–Christian tradition, the Founding Fathers

"did not consider opening prayers [in a legislative session] as a proselytizing activity or as symbolically placing the government's 'official seal of approval on one religious view,'.... Rather, the Founding Fathers looked at invocations as 'conduct whose ... effect ... harmon-

ize[d] with the tenets of some or all religions.' *McGowan v. Maryland,* 366 U.S. 420, 442 [81 S.Ct. 1101, 1113, 6 L.Ed.2d 393] (1961). The Establishment Clause does not always bar a state from regulating conduct simply because it 'harmonizes with religious canons.' *Id.,* at 462 [81 S.Ct. at 1154] (Frankfurter, J., concurring)."

*Marsh v. Chambers,* 463 U.S. 783, 792, 103 S.Ct. 3330, 3336, 77 L.Ed.2d 1019 (1983) (citation omitted).

The Court's opinion in *Jaffree,* authored by Justice Stevens, did not refute the historical evidence marshaled by Justice Rehnquist. Instead, the majority chose to emphasize the central Establishment Clause values of freedom of religious conscience and religious tolerance which had developed over the years in the "crucible of litigation." The Court stated:

"Just as the right to speak and the right to refrain from speaking are complementary components of a broader concept of individual freedom of mind, so also the individual's freedom to choose his own creed is the counterpart of his right to refrain from accepting the creed established by the majority. At one time it was thought that this right merely proscribed the preference of one Christian sect over another, but would not require equal respect for the conscience of the infidel, the atheist, or the adherent of a non-Christian faith such as Islam or Judaism. But when the underlying principle has been examined in the crucible of litigation, the Court has unambiguously concluded that the individual freedom of conscience protected by the First Amendment embraces the right to select any religious faith or none at all. This conclusion derives support not only from the interest in respecting the individual's freedom of conscience, but also from the conviction that religious beliefs worthy of respect are the product of free and voluntary choice by the faithful, and from recognition of the fact that the political interest in forestalling intolerance extends beyond intolerance among Christian sects—or even intolerance among 'religions'—to encompass intoler-

ance of the disbeliever and the uncertain."

472 U.S. at 52–54, 105 S.Ct. at 2487–88 (footnotes omitted).

Reading *Lynch* and *Jaffree* together, it is clear that the historical practice of proper governmental recognition of our American religious heritage chronicled in *Lynch,* as well as the historical interpretation of the Establishment Clause outlined in *Lynch* and Justice Rehnquist's dissent in *Jaffree,* permit the erection of holiday displays incorporating religious themes. Indeed, as Chief Justice Burger noted in concluding that the inclusion of the crèche in the holiday display in *Lynch* did not have a primary effect of advancing religion, this type of action is not "a greater aid to religion ... than ... benefits and endorsements previously held not violative of the Establishment Clause." 465 U.S. at 682, 104 S.Ct. at 1364. A crèche is hardly a greater aid to religion than the reference "so help me God" contained in an oath, and is certainly a lesser aid to religion than many of the approved school funding programs and tax exemptions set forth in the *Lynch* opinion. *See Id.* at 681–82, 104 S.Ct. at 1363–64. Any contrary holding would certainly depart from the Establishment Clause's clear and unambiguous historical intent.

Consideration of the central Establishment Clause values of respect for the believer and nonbeliever's freedom of conscience concerning religious matters and of religious tolerance set forth in *Jaffree* does absolutely nothing to change this analysis. Although respect for freedom of religious conscience and religious tolerance certainly require that religious believers refrain from using governmental means to injure non-believers and believers of other religious creeds, in light of government's historical recognition of the religious beliefs of its citizenry, these values must also be understood to require that a non-believer or a believer of another religious creed not use the courts to exclude the symbols a religious believer holds dear from a holiday display. Court ordered exclusion of a religious symbol from a display or the preven-

tion of erection of any display if it incorporates religious themes leaves adherents of any and all religions respecting the deity with the same feeling that government is hostile to their religious beliefs as the non-adherent may feel if the alleged religious symbol is included. The constitutional values of respect for freedom of religious conscience and of religious tolerance, which Justice Stevens recognized in *Jaffree*, understood in their true senses, mean that we must demonstrate consideration for others' beliefs and feelings in religious matters even when they are not the same as ours.

This action does not seem to be grounded in consideration for others' beliefs. Mather's counsel does not argue that the Village ever denied applications to erect displays which would accord with Mather's beliefs, but only states an interest in preventing the recognition of others' beliefs:

"[T]he point that I was trying to make with respect to the First Amendment is that it places a limitation on government speech and on majority speech which tends toward respecting, not establishing, but respecting an establishment of religion."

Tape of Oral Argument, December 9, 1988. This statement illustrates that the appellee is not interested in the expression or recognition of her own religious viewpoint, but rather in the suppression of recognition of another's religious viewpoint. The contention that the Establishment Clause precludes any governmental action or accommodation of religion which in any way tends toward even *respecting* an establishment of religion, rather than only action tending to *establish* a religion, is totally at odds with the Supreme Court's pronouncement in *Lynch* that the Establishment Clause is violated only by governmental action which "in reality ... *establishes* a religion or religious faith, or tends to do so." 465 U.S. at 678, 104 S.Ct. at 1362 (emphasis added). Governmental action, such as the erection of a holiday display incorporating religious themes, merely recognizes the broad Christian tradition to which many members of this society belong, and does not *"in reality"* tend to establish a state religion. Attempts to suppress this recognition are the very antithesis of the values of respect for the religious conscience of others and religious tolerance which underlie the Establishment Clause.

It is a central tenet of democracy that a majority of the people can act for the common good, while, at the same time, respecting and not infringing upon the rights of the minority. In the context of the Free Exercise Clause, the Supreme Court has emphasized Government's freedom to act for the common good, even when such actions do not accord with the religious preferences of particular individuals:

"Never to our knowledge has the Court interpreted the First Amendment to require the Government *itself* to behave in ways that the individual believes will further his or her spiritual development or that of his or her family. The Free Exercise Clause simply cannot be understood to require the Government to conduct its own internal affairs in ways that comport with the religious beliefs of particular citizens."

*Bowen v. Roy*, 476 U.S. 693, 699, 106 S.Ct. 2147, 2152, 90 L.Ed.2d 735 (1986) (emphasis in original). The erection of the crèche in this case is an action for the common good, as it recognizes the religious beliefs of many without disrespecting the beliefs of those who might disagree. Absent any showing of discrimination against displays depicting other religious faiths, I fail to understand how this display in any way tends to establish a state religion. Indeed, I believe the exact same analysis should be applied to a display which furthered the common good by recognizing the religious beliefs of persons of the Jewish, Hindu, Islamic, Buddhist or any other faith or persons who profess no faith. This is the essence of religious tolerance which underlies the Establishment Clause.

I fully appreciate that in our American pluralistic society, composed of persons of varying religious persuasions, respect for freedom of religious conscience and tolerance are ends which we are all striving to achieve. Allowing government to recognize the religious heritage of its citizens occasionally in displays, whether they be

Christian crèches, Jewish menorahs, or symbols associated with non-belief, Islam, Hinduism or Buddhism, better serves our basic freedom of religion than the suppression of any such recognition or the exacting review of the display's content and placement in which federal courts currently engage. Therefore, I join the Court in holding that Mundelein's holiday display did not violate the Establishment Clause.

EASTERBROOK, Circuit Judge, concurring.

I join the court's opinion. *City of Chicago* sets the standards in this circuit, and in light of the grant of review in *County of Allegheny* it is unnecessary for us to revisit the subject. I do not, however, abandon the views expressed in dissent in that case, 827 F.2d at 128–40. As Judge Coffey's separate opinion today shows, the use of religious symbols has long been a part of government and remains so today. If Christmas may be a holiday—that is, if states may celebrate the birth of Jesus Christ—it is difficult to condemn the government's display of a nativity scene together with the other symbols of the day. The crèche depicts the event that the day commemorates. That this symbol has religious meaning is obvious, but once we admit the holiday (mounted at great expense in holiday pay for all civil servants), the display of symbols pales. Christmas has acquired a secular meaning (it celebrates shopping, the national pastime, as well as generosity) while retaining its religious meaning. The Constitution does not simultaneously allow the state to declare a holiday in honor of this religious event and command it to pretend that the day has only secular meaning, or allow it to sponsor a display but compel it to hold the icons at a symbolic arm's length by moving them to the other side of the street. If there may be a holiday, and a display, at all, there is no constitutional virtue in the ten-foot pole. Governments display the appropriate symbols for other occasions; the holiday celebrating the life of Rev. Martin Luther King, Jr., brings readings from his sermons, unabashedly sectarian in nature. When the government speaks but does not compel others to worship or penalize those with different views, there is no serious threat to religious freedoms.

FLAUM, Circuit Judge, dissenting:

The Establishment Clause of the first amendment is not susceptible to "fixed, *per se*" rules. *Lynch v. Donnelly*, 465 U.S. 668, 678, 104 S.Ct. 1355, 1362, 79 L.Ed.2d 604 (1984). Drawing lines of demarcation to guide the effectuation of this great precept has never been an easy judicial task. Thus, courts are required to judge "every government practice ... in its unique circumstances to determine whether it constitutes an endorsement or disapproval of religion." *Id.* at 694, 104 S.Ct. at 1370 (O'Connor, J. concurring). Because I believe, that in the circumstances of this case, the Mundelein crèche display signals "to a reasonable observer," *see Witters v. Washington Dept. of Services for the Blind*, 474 U.S. 481, 493, 106 S.Ct. 748, 755, 88 L.Ed.2d 846 (1986) (O'Connor, J. concurring), a message of government endorsement of religion, I respectfully dissent.

As the per curiam opinion recognizes, this case is not conclusively resolved by *Lynch*. In *Lynch*, the municipally sponsored crèche was placed in a privately owned park. The park was across the street and some 300 feet from the city hall and, from the opinions published in that case, it is difficult to establish if the crèche was even visible from the city hall. By contrast, the crèche in this case sits on the front lawn of the Mundelein City Hall. The difference between locating the crèche in a park across the street and some distance from the city hall, and locating this distinct religious symbol on the front lawn of the city hall is, I find, under existing Supreme Court precedent, a dispositive one.

The ultimate Establishment Clause inquiry in this case remains the same as it was in *American Jewish Congress v. City of Chicago*, 827 F.2d 120, 128 (7th Cir. 1987): "whether, considered in its unique physical context, the nativity scene at issue in this case communicates a message of government endorsement." In *American*

1299

*Jewish Congress* this court answered that a crèche placed inside the Chicago City Hall "inevitably creates a clear and strong impression that the local government tacitly endorses Christianity." *Id.* at 128. The placement of the crèche in the bosom of the seat of government could not but communicate a close association between government, with all its power and prestige, and the crèche, with its sacred religious significance.

The per curiam opinion recognizes the importance of placement to the message delivered by the crèche, but concludes that this crèche is exempted because it "was outdoors, and passers-by will see a grouping of symbols, most of which are secular." While this distinction has an initially inviting simplicity, upon further reflection it is one I find unpersuasive given the immediate and critical backdrop of Mundelein's main municipal edifice. The capacity of government to convey a message of endorsement in these difficult Establishment Clause cases is not limited to the interior confines of a seat of power. Certainly any public area contiguous to such a situs can constitute a zone of identification between the state and the symbol in question. *See American Civil Liberties Union v. Alleghany County,* 842 F.2d 655, 662 (3d Cir.), *cert. granted,* — U.S. ——, 109 S.Ct. 53, 102 L.Ed.2d 32 (1988). A display containing significant religious aspects within such an immediately surrounding area can create the same constitutionally impermissible identity in the minds of those viewing the scene as would be produced in an adjoining interior. Of course, the likelihood of such identification diminishes as distance and space intervene. But where the distance is negligible, and no significant separating elements exist, the identification is unmistakable and results in exactly the same unconstitutional fusion this court found extant in *American Jewish Congress.*

In this case, as the per curiam opinion acknowledges, the crèche display resides in the shadow of the Mundelein City Hall. There are no streets or plazas or other intervening avenues of distinction, as there were in *Lynch,* to diffuse the interrelationship between the crèche and the City Hall. In the context of this particular physical setting, I do not believe that "the religious and indeed sectarian significance of the crèche ... [has been] neutralized...." *Lynch,* 465 U.S. at 692, 104 S.Ct. at 1369 (O'Connor J. concurring). Therefore, I dissent.