842 F.2d 655
 56 USLW 2549
 AMERICAN CIVIL LIBERTIES UNION, GREATER PITTSBURGH CHAPTER,
Ellen Doyle, Michael Antol, Reverend Wendy L.
Colby, Howard Elbling, Hilary Spatz
Levine, Max A. Levine and Malik Tunador
v.
COUNTY OF ALLEGHENY, a political subdivision of the
Commonwealth of Pennsylvania and the City of
Pittsburgh, a political subdivision of
the Commonwealth of
Pennsylvania,
Chabad,
Intervenor.
Appeal of AMERICAN CIVIL LIBERTIES UNION, Greater Pittsburgh
Chapter, Ellen Doyle, Michael Antol, Reverend
Wendy L. Colby, Howard Elbling, Hilary
Spatz Levine, Max A. Levine,
Appellants No. 87-3395.
Appeal of Malik TUNADOR, Appellant No. 87-3436.
 Nos. 87-3395, 87-3436.
 United States Court of Appeals,
Third Circuit.
 Argued Jan. 20, 1988.
Decided March 15, 1988.
As Amended April 7, 1988.
Rehearing and Rehearing In Banc Denied April 19, 1988.
 
 Roslyn M. Litman (argued), James B. Lieber, Litman, Litman, Harris, Brown and Watzman, P.C., Jon Pushinsky (argued), Pushinsky and Rosenfield, Pittsburgh, Pa., for appellants American Civ. Liberties Union, Greater Pittsburgh Chapter, Ellen Doyle, Michael Antol, Reverend Wendy L. Colby, Howard Elbling, Hilary Spatz Levine and Max A. Levine in No. 87-3395.
 Arlene Fickler, Hoyle, Morris and Kerr, Philadelphia, Pa., for amicus curiae American Jewish Congress in No. 87-3395.
 Nathan Lewin (argued), Miller, Cassidy, Larroca & Lewis, Washington, D.C., Charles H. Saul, Pittsburgh, Pa., for appellee Chabad.
 S. Asher Winikoff, Jones, Gregg, Gregg, Creehan & Gerace, Pittsburgh, Pa., Ruti Teitel, Justin L. Finger, Jeffrey P. Sinensky, Michael Schultz, Michael Eisenberg, Anti-Defamation League, New York City, for appellant Malik Tunador in No. 87-3436.
 George M. Janocsko (argued), Second Asst. Sol., Robert L. McTiernan, Asst. Sol., Allegheny County Law Dept., Pittsburgh, Pa., for appellee Allegheny County.
 George R. Spector (argued), Deputy City Sol., D.R. Pellegrini, City Sol., City of Pittsburgh, Dept. of Law, Pittsburgh, Pa., for appellee City of Pittsburgh.
 Before GIBBONS, Chief Judge, and WEIS and GREENBERG, Circuit Judges.
 OPINION OF THE COURT
 GREENBERG, Circuit Judge.
 
 
 1
 This action was commenced on December 10, 1986 by plaintiffs American Civil Liberties Union, Greater Pittsburgh Chapter, and certain individuals against Allegheny County and the City of Pittsburgh, political subdivisions of the Commonwealth of Pennsylvania. In general, plaintiffs alleged that the county had unlawfully permitted the erection of a creche or nativity scene depicting the birth of Jesus Christ inside the main entrance of the Allegheny County Courthouse and the city was about unlawfully to permit the erection of a menorah, a nine-branched candelabrum used by Jews as part of the religious celebration of Chanukah, on the steps of the main entrance of the City-County Building jointly owned and operated by defendants. It was asserted that the expenditure of public funds and the display of the religious symbols violated the Establishment Clause of the First Amendment of the United States Constitution applicable to the states under the Fourteenth Amendment, thus giving rise to a cause of action under 42 U.S.C. Sec. 1983. Plaintiffs sought declaratory and injunctive relief as well as nominal damages and attorneys' fees.
 
 
 2
 Following an evidentiary hearing on December 15, 1986, the court in an oral opinion made findings and denied a preliminary injunction. Thereafter Chabad, the Jewish organization which owns the menorah, was permitted to intervene and present additional evidence. On May 8, 1987 the district judge issued a memorandum opinion incorporating his prior oral findings and adding findings regarding the menorah. On that day the court entered an order denying the application for an injunction and on May 29, 1987 it entered a final judgment in favor of the defendants judgment denying and this appeal followed.
 
 
 3
 The facts in this case are simple and essentially undisputed. Annually since 1981 the county has permitted the display of a creche enclosed by a fence on the grand staircase of the first floor of the county courthouse. The creche consists of traditional figures ranging in height from three to 15 inches, including a wooden stable with the infant Jesus, the Virgin Mary, Joseph, the Three Wise Men, shepherds, various animals and an angel holding a banner reading "Gloria in Excelsis Deo" ("Glory to God in the Highest"). The creche, though stored in the basement of the courthouse, is the property of the Holy Name Society of the Diocese of Pittsburgh, a Catholic men's organization and thus a sign in front of it recites: "This display donated by the Holy Name Society." Though it is erected, arranged and disassembled each year by the moderator of the Holy Name Society, the county supplies a dolly and minimal aid to transport it to and from the courthouse basement. While the county provides no special security or illumination for the display, its Bureau of Cultural Programs decorates the creche with red and white poinsettia plants and evergreen trees purchased at public expense. The county also displays wreaths purchased through county funds. Other decorations such as trees, Santa Clauses and additional wreaths are displayed by various departments and offices throughout the courthouse building.
 
 
 4
 The creche is displayed for about six weeks from late November to early January. During the weeks prior to Christmas the county sponsors Christmas carol programs on the first floor of the courthouse with the chorale groups using the creche for a foreground. The choirs, typically high school students, sing popular songs and religious and secular Christmas carols. The caroling is broadcast by loudspeakers to the public in the courthouse. The programs are dedicated to the universal themes of world peace and brotherhood and to the memory of persons missing in action in the Vietnam War. The grand staircase and the surrounding area are used throughout the year for art displays and other civic and cultural events and programs.
 
 
 5
 The courthouse houses the principal offices of the county, including those of its governing officers, the county commissioners, and the treasurer and controller, as well as the criminal and some civil courts of Allegheny County. In view of the creche's location, it is probably seen by many visitors to the courthouse including taxpayers, lawyers trying cases or serving as arbitrators, litigants, persons desiring to search certain court records and people with business at the sheriff's office.
 
 
 6
 The City-County Building, the site of the menorah, is one block from the courthouse. The various public offices in the building include those of the city treasurer, county prothonotary, marriage license bureau and the register of wills. In addition, certain courts sit in the building. Although the building bears the name of both political subdivisions, the menorah is placed in an area maintained solely by the city. For a number of years during the Christmas season the city has installed a 45 foot Christmas tree on a platform on the front steps of the main entrance of the building and next to the tree on the steps of the main entrance to the building since 1982 the city has annually erected an approximately 18 foot high menorah. The menorah, which was purchased by Chabad, is put in place at the time of the Jewish celebration of Chanukah. In front of the tree a sign bearing the mayor's name has been erected. It recites:
 
 SALUTE TO LIBERTY
 
 7
 During this holiday season, the City of Pittsburgh salutes liberty. Let these festive lights remind us that we are the keepers of the flame of liberty and our legacy of freedom.
 
 
 8
 The display, which includes the tree and its ornaments, the platform, the sign and the menorah, is installed by city employees. In addition, the City has placed signs advertising a charity fund drive and a seasonal celebration of a flower display in front of the building.
 
 
 9
 In the district judge's oral opinion, he indicated that the case was controlled by the Supreme Court's decision in Lynch v. Donnelly, 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984). He found that neither the display of the creche nor of the menorah conveyed a message of governmental enforcement of religion. He noted:
 
 
 10
 ... none of the people who enter the Courthouse are required to do anything; they are not required to read, or to sing, or to pause or to reflect. Neither are people required to pause or look or read or make any gestures where the menorah is concerned; they are merely displays.
 
 
 11
 While he did not doubt the sincerity of witnesses who testified that the creche offended some visitors to the courthouse, he pointed out that "the Governments of the United States, Local and State and Federal do many things that are offensive to many people, and ... mere offense is not sufficient to impel the Court to issue an injunction." He continued: "There must be more substantial injury than mere offense that is felt inwardly. But it is not felt because one must read, or sing, or talk, or pause, or do something affirmatively." The judge concluded:
 
 
 12
 The mere displays, therefore, are found to be de minimis in the context of the First Amendment. I don't think there's any danger whatever that they will establish any religion. I don't think the County Commissioners or the Mayor and the City intend to affect anyone's religion, or even offend anyone. On the contrary, I think the intention was to celebrate the holiday season, and I doubt that the County or City officials paused to think that they were offending anyone. So, therefore, I just do not see very much chance of the plaintiffs succeeding on the merits. I don't think that there has really been any appreciable harm. I don't think that the mere reference to religion is actionable.
 
 
 13
 In his subsequent memorandum opinion the judge wrote:
 
 
 14
 The Chanukah menorah has no particular religious significance when placed in a public location beyond signifying a 'Light to the World' somewhat like the Christmas message 'Peace on Earth, Goodwill to Men.'
 
 
 15
 Chabad advocates the display of Chanukah menorahs in public and private places during the holiday season all over the country to symbolize the lighting of the souls of the Jewish people, i.e., to call on them to go forth and accomplish good and overcome evil.
 
 
 16
 ....
 
 
 17
 The expense to the city [in the erecting and storing the menorah] is minimal and of no consequence.
 
 
 18
 I fail to see how the display of the menorah violates the establishment clause. It may call to the attention of the public that Jews also have a miracle to remember. Certainly the local governments should not be enjoined from allowing both faiths to call attention to the miracles which enrich their histories, either the virgin birth or the burning of one day's oil for many days while the Jews sought to recapture their temple, so long as the symbols are part of a holiday season display. I should think the joint displays [send] a message that in Pittsburgh the faiths harmonize and both seek to send some light to the world at the holiday seasons. I cannot conceive that court should forbid such a thing or declare it illegal.
 
 
 19
 In a footnote to his opinion he explained that:Chanukah celebrates the recapture of the temple in Jerusalem from the Syrian Greeks in 165 B.C.E. The miracle, we understand, to be the continuous light emanating for several days from but one day's supply of oil.
 
 
 20
 We are in agreement with the trial judge that the starting point of our analysis should be Lynch v. Donnelly. There residents of Pawtucket, Rhode Island, and the Rhode Island affiliate of the American Civil Liberties Union brought an action challenging the city's inclusion of a creche in its annual Christmas display erected in cooperation with the downtown retail merchants' association in a park owned by a non-profit organization located in the heart of the shopping district. In addition to the creche, the display included many of the figures and decorations traditionally associated with Christmas, such as a Santa Claus house, reindeer pulling Santa's sleigh, candy-striped poles, a Christmas tree, carolers, cutout figures representing such characters as a clown, an elephant and a teddy bear, hundreds of colored lights and a large banner that read "Seasons Greetings." The creche, which had been included in the display for 40 or more years, consisted of the traditional figures, all ranging in height from five inches to five feet. When acquired, it cost the city $1,365 and at the time of the suit was valued at $200. The erection and dismantling of the creche cost the city about $20 per year and, though there were nominal expenses for its lighting, no money had been spent for its maintenance for the ten years preceding the suit. The district court held that the city's inclusion of the creche in the display violated the Establishment Clause and the Court of Appeals for the First Circuit affirmed. Donnelly v. Lynch, 525 F.Supp. 1150 (D.R.I.1981), aff'd, 691 F.2d 1029 (1st Cir.1982).
 
 
 21
 A sharply divided Supreme Court reversed. For the majority, Chief Justice Burger pointed out that in a First Amendment Establishment Clause case, the Court must reconcile the inescapable tension between the objective of preventing unnecessary intrusion of either the church or state upon the other, but that total separation of the two is not possible and is not required. Lynch v. Donnelly, 465 U.S. at 672-73, 104 S.Ct. at 1358-59. He then demonstrated that religion has long entered into governmental functions and thus the Supreme Court has uniformly rejected an absolutist approach in applying the Establishment Clause and instead has "scrutinized challenged legislation or official conduct to determine whether, in reality, it establishes a religion or religious faith or tends to do so." 465 U.S. at 678, 104 S.Ct. at 1361-62.
 
 
 22
 Chief Justice Burger indicated that: "In each case, the inquiry calls for line-drawing; no fixed, per se rule can be framed." 465 U.S. at 678, 104 S.Ct. at 1362. He observed that while the Court has often in Establishment Clause cases used the three-prong Lemon v. Kurtzman, 403 U.S. 602, 612-13, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971), test of whether the conduct questioned has a secular purpose, whether its principal or primary effect is to advance or inhibit religion and whether it creates an excessive entanglement of government with religion, it has "repeatedly emphasized [its] unwillingness to be confined to any single test or criterion in this sensitive area." 465 U.S. at 679, 104 S.Ct. at 1362. Thus he stated that in two cases subsequent to Lemon, Marsh v. Chambers, 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983), and Larson v. Valente, 456 U.S. 228, 102 S.Ct. 1673, 72 L.Ed.2d 33 (1982), the Court had not applied the Lemon test. Chief Justice Burger then indicated that the focus of the Court's inquiry should be on the creche in the context of the Christmas season. He wrote that there was a secular purpose for the display and the evidence did not establish the inclusion of the creche in the display was a purposeful or surreptitious effort to express some subtle advocacy of a particular religious message. 465 U.S. at 680, 104 S.Ct. at 1363.
 
 
 23
 The Chief Justice rejected the district court's finding that the primary effect of including the creche was to confer a substantial and impermissible benefit on religion in general and on the Christian faith in particular as he considered that the benefits conferred were "indirect, remote, and incidental" when compared to other governmental action upheld by the Court. 465 U.S. at 681-82, 104 S.Ct. at 1363-64. He noted that while it could be argued that the display of the creche showed an alignment of the government with Christianity, the benefit to religion was "no more an advancement of religion than the Congressional and Executive recognition of the origins of the Holiday itself as 'Christ's Mass,' or the exhibition of literally hundreds of religious paintings in governmentally supported museums." 465 U.S. at 683, 104 S.Ct. at 1364. Finally, the Court found that the third prong of the Lemon test, whether the conduct creates an excessive entanglement of government with religion, had not been violated as there had been no appreciable administrative entanglement between religion and state resulting from the city's ownership and use of the creche.
 
 
 24
 Though a decision of great significance, Lynch v. Donnelly has by no means put to rest issues involving use of religious decorations at the Christmas season nor has it foreshadowed any abandonment of the Lemon test which the Supreme Court continues to employ. See Edwards v. Aguillard, --- U.S. ----, ----, 107 S.Ct. 2573, 2576-78, 96 L.Ed.2d 510 (1987); Wallace v. Jaffree, 472 U.S. 38, 55-61, 105 S.Ct. 2479, 2489-90, 86 L.Ed.2d 29 (1985). Indeed, probably because the opinion was tied so closely to the facts involved and because of the nature of the issues, there has been considerable post-Lynch litigation with the judges as well as the litigants at odds. Of these post-Lynch cases, we find two decisions by divided courts particularly helpful, American Jewish Congress v. City of Chicago, 827 F.2d 120 (7th Cir.1987), and American Civil Liberties Union v. City of Birmingham, 791 F.2d 1561 (6th Cir.), cert. denied, --- U.S. ----, 107 S.Ct. 421, 93 L.Ed.2d 371 (1986).
 
 
 25
 In American Jewish Congress v. City of Chicago, the Court of Appeals for the Seventh Circuit dealt with a privately constructed and owned creche displayed in the lobby of the Chicago City-County Building during the holiday season. While the creche had been donated to the city, after earlier litigation it was reconveyed to the donor. 827 F.2d at 123. The creche was displayed at a prominent part of the building but the display included signs disclaiming any endorsement by the city. Ibid. A nominal amount of public funds was expended to illuminate the scene and the city maintained other Christmas decorations within the building including wreaths, a Christmas tree, a mechanical Santa Claus with reindeer and a snowman. 827 F.2d at 122.
 
 
 26
 The Court of Appeals held that the Chicago creche was a self-contained unit set apart from secular objects and thus differed from that in Lynch v. Donnelly. 827 F.2d at 125. Even more significant, however, was the circumstance that unlike that in Lynch v. Donnelly the creche in Chicago was placed at the official headquarters of the government and not in a private park. 827 F.2d at 126. The court concluded that the creche was "an unequivocal Christian symbol," 827 F.2d at 127, so that its placement in this "unique physical context" communicated a message of government endorsement which violated the second prong of the Lemon test. 827 F.2d at 128. It explained:
 
 
 27
 The presence of a government in Chicago's City Hall is unavoidable. The building is devoted to government functions: for example, both city and county government offices are located there, and the City Council holds its meetings there. Because City Hall is so plainly under government ownership and control, every display and activity in the building is implicitly marked with the stamp of government approval. The presence of a nativity scene in the lobby, therefore, inevitably creates a clear and strong impression that the local government tacitly endorse Christianity.
 
 
 28
 The message of endorsement is equally powerful on the symbolic level. Like the nativity scene itself, City Hall is a symbol--a symbol of government power. The very phrase 'City Hall' is commonly used as a metaphor for government. A creche in City Hall thus brings together Church and State in a manner that unmistakably suggests their alliance. The display at issue in this case advanced religion by sending a message to the people of Chicago that the city approved of Christianity.
 
 
 29
 The city has attempted to mitigate the impact of this message by posting six disclaimer signs on the display, two on each side, and two on the front. However, the message of government endorsement generated by this display was too pervasive to be mitigated by the presence of disclaimers. As the district court correctly noted, 'a disclaimer of the obvious is of no significant effect.' American Jewish Congress v. Chicago, No. 85 C 9471 at 14 (N.D.Ill. Nov. 5, 1986).
 
 
 30
 ' "Government promotes religion as effectively when it fosters a close identification of its powers and responsibilities with those of any--or all--religious denominations as when it attempts to inculcate specific religious doctrines. If this identification conveys a message of government endorsement ... a core purpose of the Establishment Clause is violated." ' Grand Rapids School Dist. v. Ball, 473 U.S. 373, 389, 105 S.Ct. 3216, 3226, 87 L.Ed.2d 267 (1985). The government-approved placement of the nativity scene in Chicago's City Hall unavoidably fostered the inappropriate identification of the City of Chicago with Christianity, and therefore violated the Establishment Clause. [827 F.2d at 128 (footnotes omitted, emphasis added).]
 
 
 31
 In American Civil Liberties Union v. City of Birmingham the Court of Appeals for the Sixth Circuit addressed the constitutionality of a city-owned creche built, stored and maintained at public expense and placed on the front lawn of the city hall. The court held that the placement of the creche violated the Establishment Clause as it conveyed the message that the city endorsed Christianity. It noted that the display called attention solely to the religious origin of the Christmas holiday season as it was not a portion of a larger display including a "multitude of secular symbols." 791 F.2d at 1566.
 
 
 32
 A different approach than that in the Chicago and Birmingham cases was taken by another court in McCreary v. Stone, 739 F.2d 716 (2d Cir.1984), aff'd without opinion by an equally divided Court, 471 U.S. 83, 105 S.Ct. 1859, 85 L.Ed.2d 63 (1985). There the municipality refused a group's request to be permitted to place a privately-owned creche in a municipal park in the center of the business district. The Court of Appeals for the Second Circuit considered the case from the viewpoint of protecting the applicant's First Amendment rights and thus was concerned with whether the exclusion was necessary to serve a compelling public interest. 739 F.2d at 723. The court held that it was not as the placement of the display would not violate the Lemon test. However, the matter was remanded so that an order could be entered requiring a more prominent sign disclaiming a public interest in the display.
 
 
 33
 In other cases the courts have addressed the constitutionality of the Christian cross and have recognized that the cross is a symbol of Christianity and that it is thus not only religious but also a symbol of a particular religious sect. Consequently, these courts have concluded that because a cross is more than simply a symbol of Christmas, i.e., because it possesses this independent religious significance, its placement on public buildings is an endorsement of religion. See, e.g., American Civil Liberties Union v. City of St. Charles, 794 F.2d 265 (7th Cir.), cert. denied, --- U.S. ----, 107 S.Ct. 458, 93 L.Ed.2d 403 (1986); Libin v. Town of Greenwich, 625 F.Supp. 393 (D.Conn.1985). While there seems to be little reported litigation involving menorahs, in Lubavitch of Iowa, Inc. v. Walters, 808 F.2d 656 (8th Cir.1986), it appears that the Court of Appeals affirmed the district court's denial of a preliminary injunction sought by the plaintiffs to compel a state official to allow a menorah to be placed on public grounds where a Christmas tree was displayed.
 
 
 34
 From our consideration of the foregoing cases and others, we have concluded that the second prong of the Lemon test is that most readily violated as a public entity usually is able to articulate some secular purpose for a display (first prong) and the mere placement and storage of a display will involve little entanglement (third prong) of government and religion. See American Civil Liberties Union v. City of Birmingham, 791 F.2d at 1565-66. On the other hand the use of a religious symbol in a display on public property or by a public entity may well be deemed an endorsement of religion regardless of an entity's stated reasons for its placement and thereby implicate the second Lemon prong as the impact of the display must be judged objectively. The variables that a court should consider in determining whether a display has the effect of advancing or endorsing religion include: (1) the location of the display; (2) whether the display is part of a larger configuration including nonreligious items; (3) the religious intensity of the display; (4) whether the display is shown in connection with a general secular holiday; (5) the degree of public participation in the ownership and maintenance of the display; and (6) the existence of disclaimers of public sponsorship of the display.
 
 
 35
 Application of the foregoing principles here leads inexorably to the conclusion that the district judge's determination that the second prong of the Lemon test was not violated was incorrect and cannot stand with respect to both the creche and the menorah whether we consider his findings to be matters of law or fact. See United States v. Adams, 759 F.2d 1099, 1106 (3d Cir.1985), cert. denied, 474 U.S. 906, 971, 106 S.Ct. 275, 336, 88 L.Ed.2d 236 (1985); Lame v. United States Dep't of Justice, 767 F.2d 66, 69-70 (3d Cir.1985). Each display was located at or in a public building devoted to core functions of government and each was placed at a prominent site at the public building where visitors would see it. Further, while the menorah was placed near a Christmas tree, neither the creche nor the menorah can reasonably be deemed to have been subsumed by a larger display of non-religious items. In addition, both the creche and the menorah are associated with religious holidays and would be viewed as pertaining to a particular religion. Further, the menorah, unlike the creche, is not associated with a holiday with secular aspects. There is public participation, albeit minimal, in both the storage and placement of the displays. Overall, when the record is evaluated in light of these considerations, the only reasonable conclusion is that by permitting the creche and the menorah to be placed at the buildings the city and county have tacitly endorsed Christianity and Judaism and have therefore acted to advance religion.[1] While we do not doubt that some persons find this laudable, it is impermissible under the second prong of the Lemon test and thus violates the Establishment Clause of the First Amendment.
 
 
 36
 We recognize, of course, that there is a sign near the creche indicating that the display is a donation of the Holy Name Society. That factor, however, cannot possibly outweigh the considerations which lead us to find that placement of the creche violated the second prong of the Lemon test.
 
 
 37
 In reaching our result, we have not overlooked the argument by Chabad in its brief that a menorah has "no inherent religious significance," unlike certain other objects such as a Torah scroll which contains the five books of Moses. While this distinction is not totally without significance, Chabad admits that the menorah is associated with Chanukah, a religious holiday. Further, we cannot believe that the general public would be aware of the religious fine point made by Chabad and thus view the display of the menorah as a lesser endorsement of religion than that of a Torah scroll or other object regarded as sacred. In any event regardless of the lack of religious significance of a menorah its sectarian character is clear and thus even though it may not be regarded as a sacred object its placement was an endorsement of religion.
 
 
 38
 Further, we have not ignored the finding by the district judge that the city and county have permitted the faiths to call attention to the miracles enriching their histories. This is undoubtedly so but is exactly what the governments involved here had no lawful right to do. It is clear that in reality the judge was concluding that the governments had endorsed and advanced religion in a fashion barred by Lemon and not authorized by Lynch v. Donnelly. It is not the function of government to assist religions in explaining their ideologies.
 
 
 39
 In stating our result, we emphasize that we are not here dealing with purely secular objects. Nor are we concerned with the use of religious objects in a museum or as educational instruments in a classroom, in which circumstances the objects could be presented neutrally. Thus, it could not reasonably be believed that the school authorities were endorsing a religion if they included a display of a creche or a menorah as a demonstration of religious objects in a history course. Similarly, a display of religious paintings in a public museum merely reflects an appreciation of the artistic value of the objects. Here, however, the effect was different as it is evident that the religious displays of the city and county have the effect of endorsing the messages reflected by the displays. This is unconstitutional.
 
 
 40
 In view of our result we need not consider whether either the first or third prong of the Lemon test has been violated. The order of May 8, 1988 and the judgment of May 29, 1988 will be reversed and this matter will be remanded to the district court for further proceedings consistent with this opinion.
 
 
 41
 WEIS, Circuit Judge, dissenting.
 
 
 42
 It is unfortunate that plaintiffs have succeeded in stifling governmental commemoration of two miracles which occurred about one hundred-fifty years apart in time, but so few miles in distance--and muffling the message of peace and understanding that pervades the joint observance. This aggressive "neutrality" is contrary to the spirit of religious liberty embodied in the First Amendment and will lead not to accommodation but to animosity, not to tolerance of, but hostility toward, religion.
 
 I.
 
 43
 The jurisprudence of the Establishment Clause, by far the more litigated of the two religion guarantees of the First Amendment, ranks high in confusion, inconsistency, and emotional fervor. It has provoked an enduring and highly spirited debate. At one extreme of the controversy are those who advocate an absolutist separation between religion and state, a quarantining of one from the other that verges on governmental enmity toward religion. At the other end of the debate are those who find no constitutional impropriety in governmental activity that aids all creeds equally and without discrimination.
 
 
 44
 The Supreme Court's teachings in this area have become mired between these two competing positions, each view at different times and on different issues commanding a narrow majority in the Court and emerging as the law of the land, often just temporarily. As a result, the Court's Establishment Clause decisions map out only a wavering, uncertain course of what is permissible governmental activity. Illustrative cases demonstrate the breadth of the controversy and the inconsistent results.
 
 
 45
 Absolutists would condemn all forms of government financial aid to religion. See Zorach v. Clauson, 343 U.S. 306, 318, 72 S.Ct. 679, 686, 96 L.Ed. 954 (1952) (Black, J., dissenting) ("In considering whether a state has entered this forbidden field the question is not whether it has entered too far but whether it has entered at all.") However, the Court has found no constitutional violation in the longstanding government practices of providing tax exemptions to religious institutions, Walz v. Tax Comm'n, 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970); federal grants for constructing college buildings at church-sponsored universities, Tilton v. Richardson, 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971); and vocational assistance to finance a blind person's training at a Christian college to become a pastor, missionary, or youth director, Witters v. Washington Dep't of Servs. for the Blind, 474 U.S. 481, 106 S.Ct. 748, 88 L.Ed.2d 846 (1986), although each of these programs conferred a measurable financial benefit on religion.
 
 
 46
 Similarly, the Court has ruled that a state legislature did not violate the Establishment Clause by engaging a chaplain to open each legislative session with a prayer, Marsh v. Chambers, 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983); or by enacting a statute prohibiting all commercial activity on Sunday, McGowan v. Maryland, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961). Nevertheless, a statute directing the posting of a privately-purchased copy of the Ten Commandments in school classrooms was held contrary to the Establishment Clause. Stone v. Graham, 449 U.S. 39, 101 S.Ct. 192, 66 L.Ed.2d 199 (1980).
 
 
 47
 Invoked often in cases questioning a state's financial support to parochial schools, the Establishment Clause has yielded contradictory and frequently irrational results. The Court has held that a school district may pay for students' bus transportation to parochial schools, where religion undoubtedly will be taught. Everson v. Board of Educ., 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947). But government may not finance bus trips for parochial students to a natural history museum, where religious instruction is highly unlikely. Wolman v. Walter, 433 U.S. 229, 97 S.Ct. 2593, 53 L.Ed.2d 714 (1977). A state may lend parochial schools textbooks that contain maps of the United States, Board of Educ. v. Allen, 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968), but it may not lend those same schools unbound maps of the United States for use in geography classes, Meek v. Pittenger, 421 U.S. 349, 95 S.Ct. 1753, 44 L.Ed.2d 217 (1975).
 
 
 48
 A state may provide supplementary remedial courses in math and reading to parochial school students. Wolman, 433 U.S. at 245, 97 S.Ct. at 2604. However, remedial courses taught by visiting public school teachers may not be conducted in parochial school classrooms leased by the state, cleared of religious artifacts, and bearing disclaimer signs. School Dist. of Grand Rapids v. Ball, 473 U.S. 373, 105 S.Ct. 3216, 87 L.Ed.2d 267 (1985). Numerous similar examples only make the same point. See Choper, The Religion Clauses of the First Amendment: Reconciling the Conflict, 41 U.Pitt.L.Rev. 673, 680 (1980). One must reluctantly agree with the Supreme Court's own assessment of its success in this area, that after forty-one years of trying it still "can only dimly perceive the lines of demarcation." Witters, 474 U.S. at 485, 106 S.Ct. at 751.
 
 
 49
 Commentary by legal scholars parallels the Court's deep ideological divisions. The sheer volume of publications on the subject has reached such proportions that its magnitude alone discourages judicial reference. See, e.g., Fairchild, Lynch v. Donnelly: The Case For the Creche, 29 St. Louis U.L.J. 459 (1985); Van Alstyne, Trends in the Supreme Court: Mr. Jefferson's Crumbling Wall--A Comment on Lynch v. Donnelly, 1984 Duke L.J. 770, 772 n. 5 (sampling commentary). See also Religion and the State, 27 Wm. & Mary L.Rev. 833, 833-1109 (1986) (symposium).
 
 
 50
 Particularly misleading has been the Court's recurring characterization of the Establishment Clause's objective as erecting a "wall of separation." This metaphor, originally invoked by the Court over a century ago in Reynolds v. United States, 98 U.S. (8 Otto) 145, 164, 25 L.Ed. 244 (1879), is ascribed to Thomas Jefferson. In a short note to the Danbury Baptist Association in 1802, he wrote: "I contemplate with sovereign reverence that act of the whole American people which declared that their legislature should 'make no law respecting an establishment of religion, or prohibiting the free exercise thereof,' thus building a wall of separation between church and State." Thomas Jefferson: Writings 510 (M. Peterson ed. 1984). Jefferson considered the Religion Clauses applicable to the national, but not state, government.
 
 
 51
 Justice Black later treated this reference as an expression of the Framers' intent, embracing the metaphor as a guiding principle for Religion Clause analysis. In his view, our national religious freedom was conditioned on keeping this "wall" separating church from state "high and impregnable." Illinois ex rel. McCollum v. Board of Educ., 333 U.S. 203, 212, 68 S.Ct. 461, 465, 92 L.Ed. 649 (1948); Everson, 330 U.S. at 18, 67 S.Ct. at 513.
 
 
 52
 As an interpretation of the Framers' intent, the metaphor is quite inaccurate. The author, Thomas Jefferson, was not in the country when the Clause was debated and ratified, nor does his note to the Danbury Baptist Association--written eleven years after the Establishment Clause was added to the Constitution--shed much light on the original drafters' intentions.[1] Though the phrase might have reflected James Madison's views as articulated at the time of his 1785 Memorial and Remonstrance Against Religious Assessments,[2] it does not comport with his expressed understanding of the Clause's meaning at the time of its formulation.[3]
 
 
 53
 More telling is the actual conduct of the First Congress, the body that considered and adopted the Establishment Clause. See Wallace, 472 U.S. at 100-03, 105 S.Ct. at 2513-15 (Rehnquist, J., dissenting). The First Congress reenacted the Northwest Ordinance of 1787 (providing that "[r]eligion, morality and knowledge, being necessary to good government and the happiness of mankind, schools and the means of education shall forever be encouraged"), see id. at 100, 105 S.Ct. at 2513; and implored President Washington to declare a national day of thanksgiving and prayer so that all Americans might join voices "in returning to Almighty God their sincere thanks for the many blessings he had poured down upon them," see id. at 101, 105 S.Ct. at 2513. The same week that it approved the Establishment Clause for submission to the states, the First Congress authorized the hiring of legislative chaplains. Lynch v. Donnelly, 465 U.S. 668, 674, 104 S.Ct. 1355, 1359, 79 L.Ed.2d 604 (1984).
 
 
 54
 Thus, the historical evidence is clear that the Framers did not intend the Establishment Clause to erect between religion and state a "wall of separation." In Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), the Supreme Court conceded that its "wall" reference had been an unwise choice of metaphors. "Judicial caveats against entanglement must recognize that the line of separation, far from being a 'wall,' is a blurred, indistinct, and variable barrier depending on all the circumstances of a particular relationship." Id. at 614, 91 S.Ct. at 2112.
 
 
 55
 Yet, the use of this inaccurate metaphor persists along with its unfortunate semantic overtone implying a preference for state antagonism to, rather than accommodation of, religion in the United States. As I explained in Public Funds for Public Schools of New Jersey v. Byrne, 590 F.2d 514, 522 (3d Cir.) (Weis, J., concurring), aff'd sub nom, 442 U.S. 907, 99 S.Ct. 2818, 61 L.Ed.2d 273 (1979), I find the encouragement of such a relationship between religion and state undesirable and inconsistent with the Constitution.
 
 
 56
 Recognizing the lack of a common principle in its Establishment Clause cases, the Supreme Court has attempted to offer some guidance in this sensitive area. The Court most frequently has applied the three-factor formula set out in Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). Lemon recognized the impossibility of total separation between church and state. "Some relationship between government and religious organizations is inevitable." Id. at 614, 91 S.Ct. at 2112. To assess whether that relationship in a specific case has crossed the line of permissibility, the Court examines whether the challenged law or conduct has a secular purpose, whether its principal or primary effect is to advance or inhibit religion, and whether it creates an excessive entanglement with religion. Id. at 612, 91 S.Ct. at 2111.
 
 
 57
 The Lemon approach often has been criticized as inadequate, but has been employed by the Court on most occasions--perhaps only because a better analysis has yet to command a majority. Cf. Edwards v. Aguillard, --- U.S. ----, ----, 107 S.Ct. 2573, 2607, 96 L.Ed.2d 510 (1987) (Scalia, J., dissenting) (advocating abandonment of Lemon 's purpose prong); Wallace, 472 U.S. at 91, 105 S.Ct. at 2508 (White, J., dissenting) (supporting basic reconsideration of Establishment Clause precedents); Lynch, 465 U.S. at 688-89, 104 S.Ct. at 1367-68 (O'Connor, J., concurring) (suggesting an institutional entanglement/endorsement two-part test to replace Lemon ).
 
 
 58
 Nevertheless, the Court repeatedly has refused to accept the three-part Lemon analysis as the single, dispositive "test" for evaluating a state's conduct under the Establishment Clause. See, e.g., Witters, 474 U.S. at 485, 106 S.Ct. at 751 (Court merely "guided" by Lemon ); Ball, 473 U.S. at 382-83, 105 S.Ct. at 3222 (Lemon serves to guide "the general nature of our inquiry"); Lynch, 465 U.S. at 679, 104 S.Ct. at 1362 (Lemon useful but not always relevant); Mueller v. Allen, 463 U.S. 388, 394, 103 S.Ct. 3062, 3066, 77 L.Ed.2d 721 (1983) (Lemon provides "no more than a helpful signpost"). On occasion, the Court has refused even to invoke that formula, particularly when the result would be to overturn long-established traditions. See Lynch, 465 U.S. at 679, 104 S.Ct. at 1362. Such a departure from Lemon is illustrated by Marsh v. Chambers, where the Court refused to ban either prayer sessions opening the legislative day or payment to the legislature's chaplain.
 
 
 59
 With this brief survey of an exceptionally complicated subject matter behind us, we come now to the case which, to my mind, is the controlling precedent and binds this court.
 
 II.
 
 60
 The majority agrees that Lynch v. Donnelly, 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984), should be the starting point of our analysis. I believe that Lynch also ends our analysis. That case directly addresses and conclusively resolves the dispute we encounter here. Because the district court properly applied the holding in Lynch, I would affirm its judgment.
 
 
 61
 The concern in Lynch was a creche displayed under municipal auspices and encouragement, as is the case here. In describing the town of Pawtucket's creche display, the Chief Justice wrote that the scene was "essentially like those to be found in hundreds of towns or cities across the Nation--often on public grounds--during the Christmas season." Lynch, 465 U.S. at 671, 104 S.Ct. at 1358. The creche was purchased by the town government, and assembled, disassembled, and stored by town workers. In the annual lighting ceremony, the mayor threw the switch to illuminate the creche.
 
 
 62
 In its opinion, the Supreme Court discussed at some length the competing constitutional arguments implicated by this display. It is helpful to distill key elements.
 
 
 63
 The Court first reaffirmed its holdings that complete separation between religion and state is not required, but that the Constitution "affirmatively mandates accommodation, not merely tolerance, of all religions, and forbids hostility toward any." Id. at 673, 104 S.Ct. at 1359. Thus, official pronouncements by Presidents and Congress declaring Christmas a national holiday have done so permissibly "in religious terms." Id. at 676, 104 S.Ct. at 1360.
 
 
 64
 The Court renounced the absolutist approach that would mechanically invalidate all state actions that confer a benefit on or afford special recognition to a particular religion or to religion in general. Instead, the Court explained that the challenged governmental conduct must be examined "to determine whether, in reality, it establishes a religion or religious faith, or tends to do so." Id. at 678, 104 S.Ct. at 1361-62.
 
 
 65
 The Court assumed that the Christmas creche "advances religion in a sense," id. at 683, 104 S.Ct. at 1364, and conceded that it possessed "religious significance," id. at 687, 104 S.Ct. at 1366. The opinion made clear, however, that mere advancement of religion is not the test for assessing constitutionality under the Establishment Clause. "[O]ur precedents plainly contemplate that on occasion some advancement of religion will result from governmental action." Id. at 683, 104 S.Ct. at 1364.
 
 
 66
 Although the creche "of course" is widely identified with one particular faith, in the Court's assessment this identification is no greater than that found in other cases upheld against Establishment Clause challenges. Id. at 685, 104 S.Ct. at 1365. "[N]ot every law that confers an 'indirect,' 'remote,' or 'incidental' benefit upon [religion] is, for that reason alone, constitutionally invalid." Id. at 683, 104 S.Ct. at 1364.
 
 
 67
 The Court concluded: "To forbid the use of this one passive symbol--the creche--at the very time people are taking note of the season with Christmas hymns and carols in public schools and other public places, and while the Congress and legislatures open sessions with prayers by paid chaplains, would be a stilted overreaction contrary to our history and to our holdings. * * * Any notion that these symbols pose a real danger of establishment of a state church is farfetched indeed." Id. at 686, 104 S.Ct. at 1366.
 
 
 68
 Justice O'Connor joined in the majority opinion, but wrote separately to suggest a reformulation of the Establishment Clause analysis that would hinge on a state's "endorsement" of religion. Id. at 687, 104 S.Ct. at 1366 ("I concur in the opinion of the Court. I write separately to suggest a clarification of our Establishment Clause doctrine."). Justice O'Connor expressed some concern that a government's endorsement of religion might send "a message to nonadherents that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community." Id. at 688, 104 S.Ct. at 1367 (O'Connor, J., concurring). She concluded that the resolution of this analysis in Lynch was "in large part a legal question to be answered on the basis of judicial interpretation of social facts." Id. at 694, 104 S.Ct. 1370 (O'Connor, J., concurring).
 
 
 69
 Also conceding the "religious and indeed sectarian significance of the creche," Justice O'Connor found that "the overall holiday setting ... negates any message of endorsement of that content. The display celebrates a public holiday, and no one contends that declaration of that holiday is understood to be an endorsement of religion." Id. at 692, 104 S.Ct. at 1369 (O'Connor, J., concurring).
 
 
 70
 It should be emphasized that Justice O'Connor joined not only in the judgment of the Court but in the opinion of the other four Justices as well.[4] Her concurrence, therefore, must be read as agreement with the lead opinion written by the Chief Justice and suggesting, but not requiring, an alternate rationale for reaching the same result. Justice O'Connor, as well as the Lynch majority, concluded that although the creche contains a religious element, it nevertheless passes Establishment Clause scrutiny.
 
 
 71
 Despite the clarity of the Supreme Court's holding that a municipal creche display erected during the holiday season does not constitute an impermissible endorsement of religion, two courts of appeals, over strong dissents, have ruled otherwise. These courts have pointed to irrelevant and inconsequential variations in the location of the creche display and its positioning among other Christmas symbols as factors to justify disregarding the clear spirit of Lynch.
 
 
 72
 In American Jewish Congress v. City of Chicago, 827 F.2d 120 (7th Cir.1987), the Court of Appeals for the Seventh Circuit decided that a creche scene in the lobby of the Chicago City Hall violated the Establishment Clause. The court reasoned that the location inside a government building intensified the state's "alliance" with religion, and distinguished that display from the one in Lynch erected in a private park. On that basis, the panel majority thought itself free to declare the display unconstitutional.
 
 
 73
 In American Civil Liberties Union v. City of Birmingham, 791 F.2d 1561 (6th Cir.), cert. denied, --- U.S. ----, 107 S.Ct. 421, 93 L.Ed.2d 371 (1986), the Court of Appeals for the Sixth Circuit found fault with Birmingham's "unadorned" creche--one unaccompanied by secular holiday decorations. The court concluded that without nonreligious trappings to temper its impact, a Christmas creche conveys an unconstitutional sectarian message.
 
 
 74
 In both instances, the majority opinions reflect less an attempt to apply the Supreme Court's holding in Lynch than a disapproving rejection of its message. But the judicial hierarchical system in this country mandates faithful adherence by lower federal courts to a holding of the United States Supreme Court, "no matter how misguided the judges of those courts may think it to be." Hutto v. Davis, 454 U.S. 370, 375, 102 S.Ct. 703, 706, 70 L.Ed.2d 556 (1982).
 
 
 75
 The powerful dissenting opinions in both cases demonstrate the errors of those majorities, critiques to which little need be added here. Some aspects merit emphasis, however. The City of Chicago 's governmental location distinction ignores the Supreme Court's observation in Lynch that the Pawtucket creche was essentially similar to those displays found nationwide--"often on public grounds." Lynch, 465 U.S. at 671, 104 S.Ct. at 1358. Municipal participation was no secret, and the Supreme Court treated the display as governmental action.
 
 
 76
 Moreover, the court of appeals' preoccupation with the Christmas display location in City Hall is especially perplexing in light of the Supreme Court's decision in Marsh v. Chambers. In that case, the challenged prayer service was conducted in the legislative chamber itself--not a public area of the capitol building. If the Supreme Court did not consider that practice a prohibited endorsement of the sectarian beliefs espoused by the legislatively-paid chaplain, it is difficult to understand why a creche displayed in a government building during the Christmas season cannot pass constitutional muster. Indeed, the fact that Christmas has been declared a national holiday by the state (and that action is not considered a forbidden endorsement) weighs heavily against the City of Chicago rationale.
 
 
 77
 Equally unpersuasive is the City of Birmingham 's adorned/unadorned distinction. Lynch simply does not support applying such a "Two Plastic Reindeer" rule.[5] As Justice O'Connor noted, the secular decorations surrounding the Pawtucket creche did not nullify its sectarian religious significance. Rather, the December holiday setting was the element that altered "what viewers may fairly understand to be the purpose of the display--as a typical museum setting, though not neutralizing the religious content of a religious painting, negates any message of endorsement of that content." Lynch, 465 U.S. at 692, 104 S.Ct. at 1369 (O'Connor, J., concurring).
 
 
 78
 This "unadorned" distinction, even if valid, is irrelevant here. The Pittsburgh creche was surrounded by traditional Christmas symbols, including wreaths, evergreen trees, and poinsettia plants, and served as a thematic backdrop for the County's traditional holiday choral program. The appellants' contention that these obviously secular symbols are not secular enough calls to mind Judge Nelson's admonition: "I question whether it is appropriate for the federal courts to tell the towns and villages of America how much paganism they need to put in their Christmas decorations." City of Birmingham, 791 F.2d at 1569 (Nelson, J., dissenting).
 
 
 79
 All of the courts of appeals have not disregarded Lynch. In the only unanimous post-Lynch appellate decision, the Court of Appeals for the Second Circuit rejected both the governmental location and the adorned/unadorned distinctions. McCreary v. Stone, 739 F.2d 716 (2d Cir.1984), aff'd by an equally divided Court, 471 U.S. 83, 105 S.Ct. 1859, 85 L.Ed.2d 63 (1985). There, the court found that a disclaimer sign attached to a creche served as an acceptable device to assure spectators that the municipality did not endorse religion. Though Lynch would not require such a sign, the court in City of Chicago refused to accept even that modification as a means of reducing the appearance of governmental endorsement.
 
 
 80
 The City of Chicago and City of Birmingham cases are surprising for their reexamination of the creche under Lemon, independent of the Supreme Court's application of that analysis in Lynch. Yet the Court in Lynch already had evaluated the creche display against the Lemon criteria and found it constitutional. First, the Court decided that the display had the secular purpose of depicting the historical origins of the Christmas holiday. Lynch, 465 U.S. at 680, 104 S.Ct. at 1362. Second, the Court concluded that the creche's primary effect constituted no greater an endorsement of religion than that found acceptable in prior Establishment Clause cases. Id. at 682, 104 S.Ct. at 1364. Third, the Court determined that Pawtucket's administrative entanglement in administering and maintaining the creche was de minimis. Id. at 684, 104 S.Ct. at 1365. But the Court did not end its discussion there. Rather, it proceeded to emphasize that the creche was a "passive" symbol, the banning of which would constitute "a stilted overreaction." Id. at 685-86, 104 S.Ct. at 1365-66.
 
 
 81
 The tone of Lynch is unmistakable. I have found no indication that the Pawtucket display survived constitutional scrutiny because it was situated in a private park rather than a county courthouse, or because it closely resembled a miniature golf course with candy-striped poles, talking wishing wells, and cut-out elephants. The civil government's recognition of the origins of Christmas during the holiday season simply was not perceived by the Supreme Court as a threat to the aims of the Establishment Clause. The Court all but dismissed the appellant's claim as much ado about nothing and, reading the opinion, one can imagine the Court steadfastly resisting the temptation of chiding, "Bah humbug!"
 
 III.
 
 82
 The facts of the case at hand do not differ significantly from those in Lynch. The placement of the creche in the gallery of the Allegheny County Courthouse, accompanied by poinsettia plants and evergreens, does not violate the Establishment Clause simply because plastic Santa Clauses or reindeer are absent. Neither does placing the creche in the Courthouse during the Christmas season emit any more coercive effect than the paintings displayed in the Courthouse gallery.
 
 
 83
 Appellants have not challenged the high schools' choral singing programs that take place in the same location at the Courthouse, indeed using the creche as a scenic backdrop. Unlike the creche, the singing is not passive, but rather vocalizes unquestionably religious themes. Yet those carols also are part of this nation's cultural heritage. Should they too be censored from utterance in the Courthouse? What of a municipality's holiday banner bearing Tiny Tim's timeless petition, "God bless us, everyone"? Must the name of the holiday be changed to "Winter Solstice Day" so that there can be no government "endorsement" of a "religious overtone"?
 
 
 84
 Distilled to its essence, Lynch advocated an approach of moderation, understanding, and a sense of proportion in ruling on displays commemorating the Christmas season. I think the decision in this case strays from that course.
 
 IV.
 
 85
 What, then, of the menorah? The majority relies on cases that emphasize the total grouping of the holiday symbols. It may help, therefore, to describe the spatial circumstances here. A narrow street separates the City-County Building in Pittsburgh from the Courthouse; a tunnel runs underneath, connecting the two. County offices and courts are located in the Courthouse.
 
 
 86
 The City-County Building also houses Allegheny County government offices, including the Register of Wills and the Prothonotary of the Common Pleas Court. In addition, the City-County Building also contains county courtrooms and the City of Pittsburgh offices. Rather than separate and unrelated structures, these two buildings are more accurately treated as a unified government complex. Viewed from the average citizen's perspective, the creche and the Christmas tree in the Courthouse together with the menorah affixed to the front of the City-County Building constitute but one large display commemorating the holiday season.
 
 
 87
 I assume, as the Court did in Lynch, that the challenged symbol has religious significance. I assume further that the menorah, in this context, is associated with Chanukah, a religious holiday celebrated by persons of the Jewish faith.[6] Chanukah often occurs in late December. As the district judge explained, in displaying both Jewish and Christian holiday symbols, the local governments allowed those faiths to call attention to the miracles enriching their histories, thereby demonstrating the harmony of their ideals of "bringing light to the world."
 
 
 88
 Viewing these displays as a whole, I find that the "message" conveys no more government endorsement of religion than if the creche alone were exhibited.[7] Including a reference to Chanukah did no more than broaden the commemoration of the holiday season and stress the notion of sharing in its joy. By marking the Judeo-Christian aspects of the holiday season, the local governments appropriately called attention to the great pluralism that is the hallmark of religious tolerance in this country.
 
 
 89
 I find no breach of the Establishment Clause here.
 
 V.
 
 90
 Despite many opportunities to do so, the Supreme Court has never held that state practices which afford special recognition to religious groups are, for that reason alone, constitutionally infirm. Instead, the Court has expressly rejected such a view as "contrary to the teaching of our cases that there is ample room for accommodation of religion under the Establishment Clause." Corporation of Presiding Bishop v. Amos, --- U.S. ----, ----, 107 S.Ct. 2862, 2869, 97 L.Ed.2d 273 (1987).
 
 
 91
 By publicly acknowledging the holidays of the various religions, "[w]e make room for as wide a variety of beliefs and creeds as the spiritual needs of man deem necessary." Zorach, 343 U.S. at 313, 72 S.Ct. at 683. In displaying the symbols of religious holidays during their celebration, "[w]e sponsor an attitude on the part of government that shows no partiality to any one group and that lets each flourish according to the zeal of its adherents and the appeal of its dogma." Id. Instead of contravening the Establishment Clause, such displays constitute "simply a tolerable acknowledgment of beliefs widely held among the people of this country." Marsh, 463 U.S. at 792, 103 S.Ct. at 3336.
 
 
 92
 These displays pose no threat to religious freedom, yet their suppression forebodes ominous consequences. I dissent.
 
 
 
 [1]
 Of course, we do not imply that if only a creche or only a menorah had been involved our result would have been different. Quite to the contrary we would have reached the same result if only one of the displays had been placed by defendants or either of them
 
 
 [1]
 It appears that Jefferson himself did not perceive his "wall" to be so high as to preclude state acknowledgment of religion. Judge Easterbrook cites Jefferson's preamble to his 1779 Virginia Bill for Establishing Religious Freedom: "Well aware ... that Almighty God hath created the mind free, and manifested his Supreme will that free it shall remain, ... That all attempts to influence it by temporal punishments ... are a departure from the plan of the holy author of our religion, who being Lord both of body and mind ...." American Jewish Congress v. City of Chicago, 827 F.2d 120, 135-36 (7th Cir.1987) (Easterbrook, J., dissenting). See also Crabb, Religious Symbols, American Traditions and the Constitution, 1984 B.Y.U.L.Rev. 509, 516 & n. 31 (Jefferson's Declaration of Independence contains four references to Deity, including: "We hold these truths to be self-evident, that all men ... are endowed by their Creator with certain inalienable Rights ...")
 As President, Jefferson had signed a treaty with the Kaskasia Indians providing for annual federal funding for a Catholic priest for the tribe and placing 12,000 acres of land in trust "for propagating the Gospel among the Heathen." Wallace v. Jaffree, 472 U.S. 38, 103 n. 5, 105 S.Ct. 2479, 2482 n. 5, 86 L.Ed.2d 29 (1985) (Rehnquist, J., dissenting).
 
 
 [2]
 Madison's Memorial and Remonstrance was appended to Justice Rutledge's dissent in Everson v. Board of Educ., 330 U.S. 1, 63-72, 67 S.Ct. 504, 91 L.Ed. 711 (1947)
 
 
 [3]
 Recorded in the Annals of Congress is Madison's understanding of what the new amendment meant:
 "He [Madison] believed that the people feared one sect might obtain a pre-eminence, or two combine together, and establish a religion to which they would compel others to conform. He thought if the word 'national' was introduced [before the word religion], it would point the amendment directly to the object it was intended to prevent."
 
 
 [1]
 Annals of Cong. 731. This view, that the Establishment Clause was intended only to exclude rivalry among Christian sects, was echoed by Justice Story. See 2 J. Story, Commentaries on the Constitution of the United States 631-32 (M. Bigelow 5th ed. 1891)
 As Judge Easterbrook notes, Madison may in fact have approved of a balancing test approach to the Establishment Clause. While President, Madison had proclaimed national days of fasting and thanksgiving. Though he later "recanted" this "separationist heresy," Madison pleaded de minimis non curat lex. City of Chicago, 827 F.2d at 132 n. 2 (Easterbrook, J., dissenting).
 
 
 [4]
 Cf. United States v. Mechanik, 475 U.S. 66, 73, 106 S.Ct. 938, 943, 89 L.Ed.2d 50 (1986) (O'Connor, J., concurring) (concurring in result, but rejecting majority's reasoning)
 
 
 [5]
 See Note, Of Crosses and Creches: The Establishment Clause and Publicly Sponsored Displays of Religious Symbols, 35 Am.U.L.Rev. 477, 495 (1986). Judge Nelson has described this distinction with the similarly fitting label, the "St. Nicholas, too" test. City of Birmingham, 791 F.2d at 1569 (Nelson, J., dissenting) ("a city can get by with displaying a creche if it throws in a sleigh full of toys and a Santa Claus, too")
 Actually, the Santa Claus legend is derived from folklore surrounding the life of St. Nicholas, a Catholic bishop of the fourth century. In the Dutch and German customs, St. Nicholas delivers gifts to children on December 6. The secularization process in the United States combined the St. Nicholas tradition with the birth of Christ, and both became celebrated on December 25. See J. Barnett, The American Christmas 4, 24-48 (1954); E. Count, 4000 Years of Christmas 57-63 (1948).
 
 
 [6]
 Chanukah--meaning the Days or the Feast of Dedication--is celebrated for eight days beginning on the twenty-fifth of Kislev in the Jewish calendar. It is basically a home festival, centering on the kindling of candles each evening at dusk. The festival commemorates the recapture in 165 B.C.E. of the Holy Temple in Jerusalem from the Syrian Greeks. In preparing to rededicate the temple, the Maccabees could locate only a one-day's supply of the sacred oil used to light the temple menorah. Nevertheless, the oil burned in the menorah for eight continuous days until new oil could be prepared. The next year, Chanukah was set for perpetual celebration of the Jewish nation's victory over religious persecution. See H. Gaster, Festivals of the Jewish Year 234-53 (1978); M. Ickis, The Book of Festival Holidays 88-89 (1964)
 
 
 [7]
 Unlike the posting of the Ten Commandments invalidated in Stone v. Graham, 449 U.S. 39, 101 S.Ct. 192, 66 L.Ed.2d 199 (1980), the menorah is not a permanent fixture on the Pittsburgh City-County Building; it is erected and dismantled in conjunction with the celebration of Chanukah